**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Stacey M. Kaplan (Bar. No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Melissa L. Yeates (*pro hac vice* forthcoming)
myeates@ktmc.com
Tyler S. Graden (*pro hac vice* forthcoming)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
Daniel S. Dicce (*pro hac vice* forthcoming)
ddicce@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs and the Putative Classes*

*(Additional Attorneys Listed on Signature Page)*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NIROSHINI DASSANAYAKE, KENNETH GUGEL, and ANDREW SVOBODA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC. and INSTAGRAM, LLC,<br><br>Defendants. | Case No. 26-cv-09521<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 3

III. DIVISIONAL ASSIGNMENT ..... 4

IV. PARTIES ..... 4

A. Plaintiffs ..... 4

B. Defendants ..... 4

V. FACTUAL ALLEGATIONS ..... 5

A. Defendants Generate Almost All Their Revenue by Displaying Ads on Facebook and Instagram ..... 5

B. Defendants Know Scam Ads are Rampant on Facebook and Instagram But Choose Profits Over Proven Scam-Prevention Measures ..... 7

1. Facebook and Instagram Are the Venues of Choice for an Epidemic of Online Advertising Scams ..... 7

2. Defendants Track Scam Ads and the Billions in Revenue They Generate Therefrom ..... 10

3. Defendants Have Restricted, Rejected, and Dismantled Proven Scam-Prevention Strategies to Preserve Revenues ..... 12

4. Instead of Preventing Scams, Meta Uses Its Ad Auction System to Profit from and Promote Them ..... 17

5. Defendants Fail to Respond to Scams Reported by Users and Government Regulators or Identified by Their Own Staff ..... 20

C. Defendants Materially Contribute to the Creation, Optimization, and Targeting of Scam Ads ..... 23

1. Defendants Create, Modify, and Optimize Scam Ads Through Proprietary Tools, Including Artificial Intelligence ..... 23

2. Defendants Steer Fraudulent Ads to the Most Vulnerable Victims ..... 28

D. Defendants Deceive Plaintiffs and Members of the Classes and Break Their Contractual Obligations to Prioritize Safety, Security, and Scam Prevention ..... 31

1. Defendants' Contractual Promises to Plaintiffs and the Classes ..... 31

2. Defendants Have Breached Their Contracts with Plaintiffs and Members of the Classes ..... 38

3. Defendants' Extracontractual Representations That They Will Prevent Scams on Their Platforms ... 39

E. Plaintiffs Lost Money as a Result of Ads for Crypto Investing That Defendants Targeted to Them via Facebook and Instagram ... 49

1. Ms. Dassanayake ... 49

2. Mr. Gugel ... 57

3. Mr. Svoboda ... 60

F. The Impact of Defendants' Tolerance of Scam Ads on Facebook and Instagram ... 63

VI. CLASS ACTION ALLEGATIONS ... 64

VII. CLAIMS FOR RELIEF ... 67

VIII. PRAYER FOR RELIEF ... 86

IX. DEMAND FOR JURY TRIAL ... 86

Plaintiffs Niroshini Dassanayake, Kenneth Gugel, and Andrew Svoboda (together, "Plaintiffs") bring this proposed class action against Meta Platforms, Inc. ("Meta") and Instagram, LLC ("Instagram," and with Meta, "Defendants") individually and on behalf of the Classes (defined below).[1]

## I. INTRODUCTION

1. This case arises from Defendants' role in enabling, facilitating, and materially contributing to cryptocurrency investment fraud schemes that used advertisements created or enhanced with Defendants' tools and distributed through the Facebook and Instagram social media platforms to extract billions of dollars from unsuspecting victims.

2. Defendants' core business is selling their advertising services, which include generating online advertisements and targeting them to Facebook and Instagram users based on data that Defendants collect regarding each user's interests and activities both within the Facebook and Instagram platforms and on devices linked to the user's social media accounts.

3. Defendants play an instrumental role in developing and optimizing ads to increase the likelihood of engagement, targeting particular user groups based on a range of demographic characteristics and interests, and delivering the ads to those users.

4. While Defendants have invested significantly in developing their services from the perspective of their advertising customers, they have failed to take meaningful action to prevent fraudulent advertisements, allowing their advanced ad generation and targeting technology to inure to the benefit of scammers who use Facebook and Instagram to extract billions of dollars from Defendants' users.

5. Meta has long been aware of fraudulent or scam ads on its social media platforms, but it has refused to invest meaningfully in technology, personnel, and processes to monitor, identify, and prevent these scam ads. Instead, Meta has invested in developing generative artificial intelligence

[1] The allegations herein are based on personal knowledge as to Plaintiffs' own conduct, and are made on information and belief as to all other matters, based on an investigation by counsel. Upon information and belief, Plaintiffs submit that discovery will further support the allegations in this Class Action Complaint ("Complaint").

("AI") tools that have enhanced the effectiveness of fraudulent advertisements by generating hundreds of variations which are optimized to drive engagement by vulnerable users.

6. Moreover, Defendants' own personnel have reported that Defendants have deliberately turned a blind eye to the problem of scam ads and have continued to court business from known scammers despite promising their users that they will automatically review ads for safety and "take action" when it is made aware of scams.

7. Among the multitude of scam ads on Facebook and Instagram are cryptocurrency investment scams, with scammers impersonating celebrities, well-known investors, legitimate cryptocurrency exchanges, and financial advisory firms to lure unsuspecting users into fraudulent schemes.

8. Defendants specifically have been alerted to these cryptocurrency investment scams by users, notices issued by governmental organizations, and their own internal reporting. Yet, Defendants not only have allowed cryptocurrency investment scam ads to proliferate; they have materially contributed to creating those ads and maximizing their reach and effectiveness.

9. Plaintiffs in this action were victimized by cryptocurrency investment scams promoted via ads on Facebook and Instagram. After Plaintiffs clicked on scam ads on Facebook and Instagram, fraudsters instructed the victims to make deposits to trade cryptocurrency, frequently through the messaging platform WhatsApp (also owned by Meta). The funds that victims deposited were transferred to cryptocurrency wallets controlled by the scammers and their co-conspirators.

10. When victims attempted to withdraw their purported balances, the scammers would not allow them to do so, revealing that the displayed balances were illusory and the deposited funds were gone.

11. Plaintiffs and other victims have lost significant sums of money.

12. Defendants' role in the creation and distribution of fraudulent ads through their advertising tools, and Defendants' failure to address the proliferation of these scam ads on their platforms were essential to, enabled, and facilitated the injuries to Plaintiffs and the Classes. The ads generated by Defendants' tools and technology were the critical first step in the scheme, which led to Plaintiffs and other victims interacting with and being victimized by the scammers.

13. Defendants' advertising tools develop and determine the content and appearance of the ads used to perpetrate these scams. And, Defendants' tools directed the ads to particular Facebook and Instagram users based on data indicating the users would be vulnerable to the ads, including by targeting users who demonstrated an interest in cryptocurrency and investing.

14. Plaintiffs, individually and on behalf of the Classes, bring this class action to enjoin Defendants' conduct and remedy the significant financial harm caused by Defendants to victims of cryptocurrency investment scams promoted through advertisements on Facebook and Instagram. Plaintiffs, individually and on behalf of the Classes, assert claims against Defendants for violation of California's Unfair Competition Law, Cal. Bus. and Prof. Code § 17200 *et seq*. violation of California's False Advertising Law, Cal. Bus. and Prof. Code § 17500 *et seq*., breach of express contract, breach of the implied covenant of good faith and fair dealing, negligence, negligent failure to warn, and unjust enrichment.

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, Plaintiffs are citizens of different states than one or more Defendants, and greater than two-thirds of the Class reside in states other than the state in which any Defendant is a citizen.

16. This Court has personal jurisdiction over each defendant. Defendants purposefully directed their business activity toward this District and maintained substantial contacts in this District and throughout the United States. Defendants' conduct has had the intended effect of causing injury to individuals residing in or doing business throughout the United States, including in this District. Additionally, at all relevant times, Defendants were headquartered in this District.

17. Venue is appropriate within this District under 28 U.S.C. § 1391(b) and (c)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' and the Classes' claims occurred in this District, Defendants conduct a substantial amount of business in this District, and Defendants are headquartered in this District.

18. This Court also has jurisdiction over Defendants because Meta's Terms of Service and Instagram's Terms of Use contain clauses that select this Court as the forum for resolving disputes.

19. No other forum would be more convenient for the parties and witnesses to litigate this case.

## III. DIVISIONAL ASSIGNMENT

20. This civil action arises in San Mateo County, California. Accordingly, assignment to the San Francisco Division is proper pursuant to Civil L.R.3-2(c) and Civil L.R.3-2(d).

## IV. PARTIES

### A. Plaintiffs

21. Plaintiff Niroshini Dassanayake ("Ms. Dassanayake") is a citizen of Florida and resides in Orlando, Florida. Ms. Dassanayake uses both Facebook and Instagram.

22. Plaintiff Kenneth Gugel ("Mr. Gugel") is a citizen of Georgia and resides in Atlanta, Georgia. Mr. Gugel uses both Facebook and Instagram.

23. Plaintiff Andrew Svoboda ("Mr. Svoboda") is a citizen of Illinois and resides in Oak Brook, Illinois. Mr. Svoboda uses Instagram.

### B. Defendants

24. Defendant Meta Platforms, Inc. is a Delaware corporation, with its principal executive offices located in Menlo Park, California. Meta is a global technology company that provides social media platforms and communications services to users worldwide, as well as advertising services to millions of companies. Under Meta's Terms of Service, California law applies to this dispute. Meta operates the Facebook social media platform.

25. Defendant Instagram, LLC is a wholly owned subsidiary of Meta Platforms, Inc. Instagram is a Delaware limited liability company headquartered in Menlo Park, California. Under Instagram's Terms of Use, California law applies to this dispute. Instagram operates the Instagram social media platform.

## V. FACTUAL ALLEGATIONS

### A. Defendants Generate Almost All Their Revenue by Displaying Ads on Facebook and Instagram

26. Meta owns and operates two of the world's largest social media and communications platforms, Facebook and Instagram. These platforms have billions of users who access the platforms multiple times daily and are the means through which Meta engages with consumers, collects user data, and sells advertising to third parties.

27. Facebook allows users to create personal profiles, share content, communicate with other users, join interest-based groups, and access news and entertainment. Facebook is the most widely used social network in the world,[2] with more than 3 billion monthly active users globally as of 2024.[3] In the United States alone, Facebook has approximately 253 million monthly active users,[4] making it one of the dominant channels through which American consumers receive information, engage with businesses, and are exposed to advertising content. According to Pew Research Center, Facebook is one of only two social media platforms used by a majority of U.S. adults across every age group.[5]

28. Instagram is a photo and video sharing social media platform that Meta acquired in April 2012 for approximately $1 billion. Since acquiring Instagram, Meta has expanded Instagram into a multifaceted platform featuring photo and video posts, short-form video content (known as "Reels"), disappearing content ("Stories"), direct messaging, and integrated e-commerce functionality. Instagram has grown into one of the most popular social media platforms in the world,

---

[2] Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 29, 2025), https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm.

[3] Press Release, Meta Platforms, Inc., Meta Reports Fourth Quarter & Full Year Results (Jan. 29, 2025), https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx.

[4] Naveen Kumar, *Facebook Users Statistics 2026 – Global Data & Growth Trends*, DemandSage (May 7, 2026), https://www.demandsage.com/facebook-statistics.

[5] Jeffrey Gottfried & Eugenie Park, *Americans' Social Media Use in 2025*, Pew Research Center (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/.

surpassing 3 billion monthly active users globally.[6] In the United States, Instagram has approximately 171 million users. Instagram's combination of visually driven content, powerful algorithmic content distribution, and broad demographic reach makes it a particularly influential—and particularly lucrative—platform for third-party advertising.

29. Meta's business model is premised almost entirely on advertising revenue generated through the sale of targeted advertising placements to third-party advertisers across platforms. For example, over $196 billion—or nearly 98 percent—of the $201 billion in total revenue that Meta reported for 2025 came from advertising.[7] And, while Meta doesn't disclose the total number of ads it shows its 3.56 billion "daily active people," it reported in April 2026 that total "ad impressions"—that is, displays of ads to individual users—were up 19 percent year-over-year.[8]

30. Meta generates this advertising revenue by allowing third-party advertisers to purchase ad placements that are targeted to specific users based on detailed demographic, behavioral, and interest-based data that Meta collects from its platforms.[9] Through this model, Meta actively reviews, approves, and publishes third-party advertisements to its billions of users, including the fraudulent and deceptive scam advertisements that are the subject of this action.

31. Indeed, in discussing Meta's business model, commentators often observe that "the users are the product."[10] By attracting a vast audience about whom Meta has amassed detailed data concerning their characteristics and interests, Meta has created the preeminent platforms for selling advertising.

---

[6] Naveen Kumar, *How Many People Use Instagram in 2026 [Active Users Stats]*, DemandSage (Mar. 7, 2026), https://www.demandsage.com/instagram-statistics/ (reporting approximately 171.7 million Instagram users in the United States).

[7] Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 27, 2026), https://www.sec.gov/Archives/edgar/data/1326801/000162828026003942/meta-20251231.htm.

[8] Press Release, Meta, *Meta Reports First Quarter 2026 Results* (Apr. 29, 2026), https://investor.atmeta.com/investor-news/press-release-details/2026/Meta-Reports-First-Quarter-2026-Results/default.aspx.

[9] Dorothy Neufeld, *Charted: How Does Meta Make Money?*, Visual Capitalist (Mar. 21, 2025), https://www.visualcapitalist.com (citing Meta's 2024 Form 10-K and noting that advertising accounted for "virtually all" of Meta's revenues in 2024).

[10] *See, e.g.*, Shelly Kramer, *Metaverse Privacy Concerns: Are We Thinking About Our Data?*, Forbes (June 1, 2022), https://www.forbes.com/councils/forbestechcouncil/2022/06/01/metaverse-privacy-concerns-are-we-thinking-about-our-data/; David Nield, *You Probably Don't Know All the Ways Facebook Tracks You*, Gizmodo (June 8, 2017), https://gizmodo.com/all-the-ways-facebook-tracks-you-that-you-might-not-kno-1795604150.

### B. Defendants Know Scam Ads are Rampant on Facebook and Instagram But Choose Profits Over Proven Scam-Prevention Measures

#### 1. Facebook and Instagram Are the Venues of Choice for an Epidemic of Online Advertising Scams

32. Online scams are an increasingly significant threat to consumers in the United States and worldwide. According to the U.S. Federal Bureau of Investigation ("FBI"), online crime caused a record $20.9 billion in losses for Americans in 2025.[11] Almost 85% of the losses identified by the FBI in 2025 resulted from scams using the internet or other technology to commit fraud.[12]

33. Facebook and Instagram are major vehicles for—and contributors to—this deluge of online scams that are deceiving ordinary consumers.

34. Meta's massive advertising enterprise has become a major venue for online scammers. An internal Meta presentation in May 2025 estimated that Meta was involved in one third of all successful Internet scams in the United States. As *Reuters* reported, Meta "internally estimates that its platforms show users 15 billion scam ads a day," resulting in an estimated $7 billion in revenue for Meta annually.[13]

35. Moreover, the U.S. Federal Trade Commission found that in 2025, more than 70% of money lost to scams perpetrated via social media took place on Facebook, Instagram, and Meta's WhatsApp messaging platform.[14]

36. In May 2025, *The Wall Street Journal* described Facebook and Instagram as "a cornerstone of the internet fraud economy, according to regulators, banks and internal documents" it reviewed.[15] According to that report, ads on Meta platforms "accounted for nearly half of all reported

---

[11] U.S. FBI, *FBI Releases Annual Internet Crime Report* (2025), https://www.fbi.gov/file-repository/2025_ic3report.pdf/view.

[12] *Id*.

[13] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[14] Division of Consumer Response & Operations Staff, *Reported losses to scams on social media eight times higher than in 2020*, FTC (Apr. 27, 2026), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2026/04/reported-losses-scams-social-media-eight-times-higher-2020.

[15] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.

scams on Zelle for JPMorgan Chase between the summers of 2023 and 2024," and other banks offering Zelle report similar experiences. Similarly, in January 2025, the Managing Director of the UK Payment Systems Regulator reported that "Meta platforms (Facebook, Instagram, WhatsApp) feature as the top three platforms being targeted by fraudsters to carry out the most common type of [authorized push payment] scam—purchase scams."[16]

37. The scam ads on Meta's platforms are pervasive and widely varied, ranging from complex financial scams to deceptive ads touting products that will never be delivered.

38. For example, an internal Meta document from 2022, as disclosed by *Reuters'* reporting, reflects that "Meta discovered a six-figure network of accounts pretending to be members of the U.S. military deployed in war zones" that "were sending millions of messages a week trying to charm Facebook users into losing their money."[17] Along with scams that used the identities of members of the military, Meta knew about "a torrent of fake accounts pretending to be celebrities or represent major consumer brands [that] were bamboozling users worldwide."[18]

39. And the scams are not limited to impersonations of celebrities and military personnel. Indeed, there are numerous examples of scammers impersonating businesses large and small on Meta's platforms. For example, the investment advisory firm Capital Wealth Planning, LLC, based in Florida, was forced to issue a press release in June 2024 to warn the public that scammers impersonating that firm were soliciting investors on Meta's WhatsApp platform.[19] The firm notified Meta, which did not rectify the situation. In December 2024, the Washington State Department of Financial Institutions issued a public warning about these scams.[20] In February 2025, the same

[16] *David Geale's speech at the Payments Regulation and Innovation Summit 2025*, Payment Systems Regulator (Jan. 30, 2025), https://www.psr.org.uk/news-and-updates/speeches/speeches/david-geales-speech-at-the-payments-regulation-and-innovation-summit-2025/.
[17] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.
[18] *Id.*
[19] Press Release, *Unknown Rogue Elements Impersonate Capital Wealth Planning, LLC and Its Founder and Chief Executive Officer, Kevin Simpson*, Capital Wealth Planning, LLC (June 7, 2024), https://capitalwealthplanning.com/press-release-6-7-2024/.
[20] *WhatsApp group impersonating Capital Wealth Planning, LLC appears to be engaged in fraud*, Washington State Dep't of Fin. Inst (Dec. 9, 2024), https://dfi.wa.gov/consumer/alerts/whatsapp-group-impersonating-capital-wealth-planning-llc-appears-be-engaged-fraud.

Washington agency issued another public warning that scammers on WhatsApp were impersonating three other investment firms.[21]

40. According to current and former employees, as well as industry experts, "Facebook [(now Meta)] typically keeps the money it earns from scam ads and fraudulent campaigns that pollute its platforms, unless it involves credit card fraud."[22]

41. For example, Meta "earned more than $50 million in revenue over two years from a single shady San Diego marketing agency that ripped off Facebook users by tricking them into hard-to-cancel subscriptions and investment scams."[23]

42. These are not isolated examples of scams. In June 2025, a bipartisan coalition of 42 state attorneys general sent a letter to Meta requesting "immediate action to address widespread investment scams on Facebook and WhatsApp."[24] And, in April 2026, multiple attorneys general issued alerts warning residents about the prevalence of fraudulent investment scams on Meta platforms.[25]

---

[21] *Id*.

[22] Craig Silverman and Ryan Mac, *Facebook Gets Paid*, Buzzfeed News (Dec. 10, 2020), https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam.

[23] *Id*; *see also* Facebook's Purchase Protection program only refunds money for purchases checked out through the Facebook website; purchases made through third-party sites, do not qualify for Purchase Protection. *See* Using Facebook, *How Purchase Protection works on Facebook*, Facebook, https://www.facebook.com/help/228307904608701 (last visited Aug. 27, 2026).

[24] Letter to Jennifer Gillian Newstead, Esq. Chief Legal officer of Meta Platforms, Inc. from Nat'l Assoc. of Attys. Gen. (June 5, 2025), https://www.naag.org/wp-content/uploads/2025/06/Letter-to-Meta-re-Scam-Investments-_FINAL.pdf.

[25] Press Release, *CONSUMER ALERT – Attorney General Brown Issues Warning on Investment Scams on Meta Platforms*, MD Att'y Gen. Brown (Apr. 6, 2026), https://oag.maryland.gov/News/pages/CONSUMER-ALERT---Attorney-General-Brown-Issues-Warning-on-Investment-Scams-on-Meta-Platforms-.aspx; Press Release, *Attorney General Bonta Warns Californians of Investment Scams on Facebook, Instagram, and WhatsApp*, Cal. Att'y Gen. Bonata (Apr. 6, 2026), https://oag.ca.gov/news/press-releases/attorney-general-bonta-warns-californians-investment-scams-facebook-instagram; Press Release, *Attorney General Sunday Warns Pennsylvanians to Beware of Investment Scams on Facebook, Instagram, WhatsApp*, Penn. Att'y Gen. Sunday, (Apr. 6, 2026), https://www.attorneygeneral.gov/taking-action/attorney-general-sunday-warns-pennsylvanians-to-beware-of-investment-scams-on-facebook-instagram-whatsapp/; Press Release, *AG Nessel Warns of Investment Scams on Meta Platforms*, Mich. Att'y Gen. Nessle (Apr. 9, 2026), https://www.michigan.gov/ag/news/press-releases/2026/04/09/ag-nessel-warns-of-investment-scams-on-meta-platforms; Press Release, *Attorney General Jeff Jackson Warns North Carolinians of Investment Scams on Meta Platforms*, N.C. Att'y Gen. Jackson, (Apr. 17, 2026), https://ncdoj.gov/attorney-general-jeff-jackson-warns-north-carolinians-of-investment-scams-on-meta-platforms/; Matt Wyatt, *State of NH Attorney General Formella Warns of Investment Scams on*

43. Other sources have tracked the multitude of scammers on Meta's platforms that have not been blocked by Meta. For example, Gary Warner, director of intelligence at the cybersecurity firm DarkTower, tracks thousands of Facebook groups dedicated to luring people into cryptocurrency investment scams, among others.[26] Such groups are often engaged in so-called "pig butchering" or "confidence" scams, through which a target is first allowed to profit from purportedly legitimate solicitations to "fatten" them or win their trust before they are scammed for a large amount. The amounts ultimately taken from the victims of such scams are often significant, reaching six or seven figures.[27]

### 2. Defendants Track Scam Ads and the Billions in Revenue They Generate Therefrom

44. Defendants are well aware of the volume of scam ads on Facebook and Instagram because they track these ads closely—along with the revenues they generate.

45. As described above, Meta itself has determined that its platforms show users some 15 billion scam ads each day. What's more, Meta has determined that its platforms are uniquely hospitable to scam ads: In April 2025, Meta reviewed discussions among online scammer communities and internally concluded that "[i]t is easier to advertise scams on Meta platforms than

*Meta Platforms*, The Rochester Post (Apr. 24, 2026), https://news.rochesternh.gov/state-of-nh-attorney-general-formella-warns-of-investment-scams-on-meta-platforms/.

[26] Lily Hay Newman & Matt Burgess, *Meta Finally Breaks Its Silence on Pig Butchering*, Wired (Nov. 21, 2024), https://www.wired.com/story/meta-pig-butchering-report-2024/.

[27] The impact on victims of such scams can be financially and emotionally debilitating. For example, ABC7 News reported on two retirees in California who fell prey to scams perpetrated on Meta platforms and lost $500,000 and $1 million, respectively, which both scam victims described as their life savings. Both scams began on Facebook and moved to WhatsApp. In the case of an elderly widow in San José, both ABC7 News and Yahoo! Finance report that scammers "took nearly $1 million of her money." As is common in "pig-butchering" scams, the scammer began with a $15,000 "test" trade on a crypto platform that appeared to generate substantial profits for the widow. She was then told to invest $490,000 from her IRA, and later to add still more money to unlock funds when the account was "frozen." The victim ultimately drew down retirement accounts and took out a second mortgage, sending the scammer nearly $1 million in total. According to ABC7 News, the scam emptied her retirement savings and put her home at risk, leaving her with "almost nothing to live on." Stephanie Sierra and Renee Koury, *Pig butchering: Bay Area widow loses nearly $1M in crypto scheme, ChatGPT alerts her to scam*, ABC News 7 (Dec. 6, 2025), https://abc7news.com/post/pig-butchering-bay-area-widow-loses-1m-crypto-scheme-chatgpt-alerts-scam/18247111/; Stephanie Sierra and Renee Koury, *SF retiree loses $500K life savings to pig butcher scam despite warnings from family, friends*, ABC News 7 (Feb. 19, 2026), https://abc7news.com/post/7-side-bay-area-retiree-ignores-warnings-wires-500k-life-savings-fake-woman-pig-butcher-scam/18613588/.

Google."[28] In fact, by Meta's own account, new legitimate advertisers on its platforms are outnumbered by new scam advertisers: "[a]n internal analysis from 2022 . . . found that 70% of newly active advertisers on the platform[s] are promoting scams, illicit goods or 'low quality' products."[29]

46. Both Meta's employees and Meta's leaders understand the ubiquity of scam ads on Meta platforms. Meta platforms are so rife with scam advertisers that Meta staff have produced an internal report of the "Scammiest Scammers"—a profile of each week's most-complained-about advertisers.[30] And, on information and belief, Meta's executive leadership is regularly apprised of this scam-ad epidemic through periodic reports that set forth the percentage of ads identified as illicit that have been shown to consumers, as well as the revenues generated by such ads.

47. Meta tracks the revenue derived from policy-violating ads—including the premiums charged by Meta for showing users ads it has identified as fraudulent or likely to be fraudulent—and labels this funding stream "violating revenue." A 2024 internal document reflects Meta's estimate that scam ads annually generate about $7 billion in "violating revenue."[31]

48. Meta's incentive to preserve its "violating revenue" steers its approach to scam prevention. A 2025 internal document highlights Meta's "concern[] that abrupt reductions of scam advertising revenue could affect its business projections."[32]

49. In May 2025, *The Wall Street Journal* reported that Meta is reluctant to create impediments for ad-buying clients in view of the Company's dependence on advertising for

---

[28] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[29] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.

[30] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[31] *Id.*

[32] *Id.*

substantially all of its revenues.[33] In fact, Meta refuses to remove advertisers even when they have a demonstrated history of scamming.[34]

50. Meta purports to use a "strike system to count violations and hold [users] accountable for the content [that they] post."[35] However, an internal company document from late 2024 shows that Meta will allow an advertiser to accrue between 8 and 32 automated "strikes" for financial fraud before it bans their accounts.[36]

### 3. Defendants Have Restricted, Rejected, and Dismantled Proven Scam-Prevention Strategies to Preserve Revenues

51. Moreover, Defendants have deprioritized scam enforcement in recent years, including abandoning plans for advertiser verification requirements and failing to invest in automated tools or the personnel needed to effectively identify and remove scam ads.[37]

52. The limiting principle on Defendants' scam-prevention efforts is simple: protect Meta's bottom line. Consistent with this principle, a 2022 internal document acknowledges Meta's "lack of investment" in building scam-detection tools. Instead, Meta has actively restricted, rejected, and dismantled proven strategies to combat scam ads.[38]

53. These "revenue guardrails" have stymied scam-prevention efforts. For instance, a May 2025 internal Meta document discusses how Meta identified that a collection of 800 advertising accounts in the previous month alone that had generated $28 million in ads that violated Meta's rules.[39] When a staffer asked colleagues if Meta intended to punish the advertising partners who

---

[33] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.
[34] *Id.*
[35] *Taking down violating content*, Meta (Nov. 12, 2024), https://transparency.meta.com/enforcement/taking-action/taking-down-violating-content/
[36] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.
[37] *Id.*
[38] *Id.*
[39] Jeff Horwitz & Engen Tham, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, Reuters (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/.

controlled the accounts, they were told no on the ground that "the revenue impact is too high."[40] Although Meta did shut down a handful of these accounts that human reviews had found to be overwhelmingly running banned ads, it did so only after concluding that the accounts were responsible for just $2.8 million of the policy-violating ads. Meta staff added that the scammers could soon return to Meta platforms through other accounts, and that it was therefore "likely" that even that fraction of lost "revenue will return."[41]

54. In addition to setting "revenue guardrails" on its anti-scam work, Meta treats potential penalties from regulators as no more than a cost of doing business. Internal Meta documents reflect that Meta balances the cost of scam prevention—including regulatory fines likely to be imposed for failing to implement adequate scam-prevention measures—against the advertising revenue that Meta would lose if scam-prevention measures or regulatory compliance reduced the number of scam ads on Meta platforms. For example, Meta weighed the $1 billion it anticipated in annual penalties against the $3.5 billion it would earn every six months from scam ads; "those fines," Meta concluded, "would be much smaller than Meta's revenue from scam ads."[42] Accordingly, "[r]ather than voluntarily agreeing to do more to vet advertisers, the same document states, the company's leadership decided to act only in response to impending regulatory action."[43]

55. In line with this decision, Meta tailors its scam-prevention efforts to heading off immediate action from regulators rather than protecting users. In October 2024, Meta executives proposed to CEO Mark Zuckerberg a "moderate" approach to scam enforcement by focusing on countries where they feared "near-term regulatory action."[44] As *Reuters* reported, this "moderate" approach defined scam-prevention goals in terms of total revenue:

> Meta executives in charge of enforcing the integrity of the company's platforms settled on trying to reduce the percentage of revenue attributable to scams, illegal gambling and prohibited goods from an estimated 10.1% in 2024 to 7.3% by the end

---

[40] *Id.*
[41] *Id.*
[42] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.
[43] *Id.*
[44] *Id.*

> of 2025. By the end of 2026, Meta aims to further cut that figure to 6%, and then to 5.8% in 2027.[45]

By using these metrics to evaluate scam-prevention efforts, Meta could "succeed" simply by increasing its overall revenue—and without reducing the number of scam ads.

56. Defendants have also developed strategies to mislead and stall regulators. According to *Reuters*, Meta "sought to make problematic ads less 'discoverable' for Japanese regulators" in 2024.[46] Specifically, after determining that regulators were searching Meta's "Ad Library" for examples of problematic ads, Meta staff "identified the top keywords and celebrity names that Japanese Ad Library users employed to find the fraud ads," then "ran identical searches repeatedly, deleting ads that appeared fraudulent from the library and Meta's platforms."[47] While that process did result in the removal of some problematic ads, it also had the misleading effect of "mak[ing] the search results that Meta believed regulators were viewing appear cleaner than they otherwise would have." Meta later included this "search-result cleanup" strategy in its "general global playbook" to evade regulatory scrutiny worldwide.[48] That "playbook" also includes instructions for delaying regulators, like "[k]eep engaging with regulator on extension."[49]

57. Meanwhile, Meta has declined to implement universal advertiser verification—a proven, cost-effective process that would require Meta to verify the identities of all advertisers on its platforms. Google implemented universal advertiser verification in 2020 and, within five years, was verifying 90 percent of advertisers on its platforms; by contrast, in 2024, only 55 percent of Meta's ad revenue came from verified advertisers. Rather than implementing universal verification, Meta has adopted what it calls a "reactive only" stance, under which it will implement universal verification "only if lawmakers mandate it"—and will otherwise continue to implement its playbook to dodge and hinder regulatory scrutiny.[50]

---

[45] *Id.*
[46] Jeff Horwitz, *Meta created 'playbook' to fend off pressure to crack down on scammers, documents show*, Reuters (Dec. 31, 2025), https://www.reuters.com/investigations/meta-created-playbook-fend-off-pressure-crack-down-scammers-documents-show-2025-12-31/.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

58. Rejecting universal advertiser verification marks just another way in which Meta has prioritized its bottom line over scam prevention. Meta calculated that universal advertiser verification would cost roughly $2 billion in direct expenses to implement on a global level, and it could be implemented in any of the countries where Meta operates in less than six weeks.[51] Meta also determined "that unverified advertisers are disproportionately responsible for harm on Meta's platforms" and that implementing universal verification would "reduce scam activity."[52] But Meta estimated that universal advertiser verification would eliminate almost 5 percent of total advertising revenues.[53] Meta thus decided against implementing universal advertiser verification. Beyond the risk of lost advertising revenue from scammers, Meta was concerned that implementing free universal advertiser verification would cannibalize revenues from its "Verified for Business" verification product, through which Meta charges advertisers up to $349.99 each month for the right to display a badge confirming that Meta has authenticated the account.[54]

59. A 2025 *Wall Street Journal* report confirms that Meta has deprioritized scam-prevention efforts, including advertiser verification, to avoid losing revenue:

> Documents reviewed by the *Journal* show that Meta has deprioritized scam enforcement in recent years, emphasizing the avoidance of erroneous ad takedowns over safety concerns. The company has also been cutting costs and shifting resources to other issues in the reshuffling.
>
> The company abandoned plans for advertiser verification requirements similar to what it mandates for political ads, people familiar with the matter say, on the grounds that it worried about losing revenue from marketers unwilling or unable to pass identity checks.[55]

60. Worse yet, Meta has rolled back effective scam-prevention efforts by laying off or disbanding entire anti-scam teams.

61. For example, in 2023, Meta laid off the entire team investigating complaints raised by advertisers regarding scams that impacted legitimate brands. Meta's investment in and focus on

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.

developing AI and virtual-reality offerings apparently hampered the efforts of the remaining scam-prevention staff, who were "ordered to restrict their use of Meta's computing resources" and "merely to 'keep the lights on.'"[56]

62. Similarly, in late 2024, Meta disbanded an entire team that focused on preventing scams originating in China.[57]

63. In early 2024, Meta had identified scammers in China as a particularly significant source of scams on Meta platforms. According to an internal 2024 presentation reviewed by *Reuters*, "Meta believed China was the country of origin of roughly a quarter of all ads for scams and banned products on Meta's platforms worldwide."[58] Meta consequently designated China the top "Scam Exporting Nation." Meta knew that Chinese "scam exports" on its platforms targeted many consumers outside of China, including in California and the rest of the United States. And Meta knew that these scam ads were lucrative: Internal Meta documents reflect Meta's determination that more than $3 billion in ad revenue—about 19 percent of the Company's annual ad sales to Chinese companies—was generated by ads for scams and other prohibited content in 2024.[59]

64. In response to the spread of Chinese scam ads, Meta created a special team to focus on fraud originating in China. By the second half of 2024, that team had reduced problematic ads from Chinese businesses to roughly 9 percent of the Company's China ad revenue.[60]

65. This successful effort eliminated over $1 billion in Meta's revenue. Thereafter, documents described by Reuters indicate that the team was suspended and then terminated at Meta CEO Mark Zuckerberg's behest. A 2024 document states, "As a result of Integrity Strategy pivot and follow-up from Zuck," the special team was "asked to pause" its scam-prevention efforts. Internal documents also reflect that "after Zuckerberg's input . . . Meta disbanded its China-focused anti-scam

[56] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.
[57] Jeff Horwitz & Engen Tham, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, Reuters (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/.
[58] *Id.*
[59] *Id.*
[60] *Id.*

team. It also lifted a freeze it had introduced on granting new Chinese ad agencies access to its platforms. One document shows that Meta shelved yet other anti-scam measures that internal tests had indicated would be effective."[61] By early 2025, Meta appears to have abandoned efforts to further reduce Chinese frauds on its platforms. An internal February 2025 document described by Reuters reveals that Meta determined to simply accept the higher level of fraud emanating from China and "maintain the % of global harm" coming from China rather than trying to reduce that fraud, as it had publicly stated it was committed to doing. By mid-2025, scam ads had "climbed back to about 16%" of the ad revenue the Company generated in China.[62]

66. Meta's treatment of Chinese scam advertisers led Propellerfish, a consultant retained by Meta, to warn Meta in 2024 that "'Meta's own behaviour and policies' were fostering systemic corruption in the Chinese market for ads targeting users in other countries," as Reuters' review of Meta's internal documents reflects. Propellerfish concluded that Meta was "more tolerant of illicit practices in China" than other major online platforms were, with scammers viewing Facebook's enforcement efforts "as inconsistent" compared to TikTok's "stricter" protocols and the identity checks required by Google.[63]

67. In sum, for Meta, scam prevention is ancillary to revenue protection. When scam-prevention strategies threaten revenue, Meta is not afraid to reduce enforcement.

### 4. Instead of Preventing Scams, Meta Uses Its Ad Auction System to Profit from and Promote Them

68. Defendants not only identify scam ads that they nonetheless show to users on Facebook and Instagram; they also charge higher advertising fees to—and make higher profits from—suspected scammers. [64]

69. Advertisers must pay to compete in the online auction process by which ads are placed on Facebook and Instagram.

---

[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

70. In 2024, Meta began charging higher fees to run ads that it had already determined were likely scams. Based on its review of internal Meta documents created between 2021 and 2025, *Reuters* reported the following about this new surcharge:

> A cache of previously unreported documents reviewed by Reuters also shows that the social-media giant for at least three years failed to identify and stop an avalanche of ads that exposed Facebook, Instagram and WhatsApp's billions of users to fraudulent e-commerce and investment schemes, illegal online casinos, and the sale of banned medical products. . . . Much of the fraud came from marketers acting suspiciously enough to be flagged by Meta's internal warning systems. **But the company only bans advertisers if its automated systems predict the marketers are at least 95% certain to be committing fraud, the documents show. If the company is less certain – but still believes the advertiser is a likely scammer – Meta charges higher ad rates as a penalty, according to the documents**. . . . Before the bidding, the company's automated systems calculate the odds that an advertiser is engaged in fraud. Under Meta's new policy, likely scammers who fall below Meta's threshold for removal would have to pay more to win an auction.[65]

71. Internal Meta documents further indicate that Meta can adjust the number of illicit ads that are shown to consumers—for example, by raising the 95 percent threshold—and has the ability to do so to smooth earnings or hit specific revenue targets.[66]

72. Meta internally refers to the premium charged to run scam ads as "penalty bids."[67] While Meta has tried to spin this policy as an effort to reduce scam ads, that claim is belied by the fact that ads subject to "penalty bids" have already been identified by Meta as likely scams even before those advertisers bid in the ad auction. To prevent fraud, Meta need only reject those scam ads. Instead, Meta runs ads it has deemed likely to be scams. By charging an extra "penalty bid" to run such ads, Meta is not combating scams but facilitating, promoting, and profiting from them.[68]

73. Another aspect of Meta's ad auction process further facilitates and promotes scam ads: the assignment of a "quality" value. As has been widely reported, Meta's complex auction process is not based simply on an advertiser's financial bid to run ads. Rather, Meta's process incorporates what it has referred to as a "quality" component of the auction bid. That component, which is determined and applied by Meta, reflects factors such as the relevance of the ad to the intended audience and how well the ad flows alongside user-generated content. For example, if an advertiser bids $2 to place an

---

[65] *Id.* (emphasis added).
[66] *Id.*
[67] *Id.*
[68] *Id.*

ad and Meta assigns that advertisement a quality value of $2, the advertiser's total bid would be $4, and that bid might displace a competing bid by an advertiser that offered $3 but had a quality component of only $0.50. Meta's explanation for this system is that it encourages and rewards high-quality, relevant ads that will enhance the experience of Meta users and increase user interaction with Meta platforms.[69]

74. However, because scam advertisers are permitted to compete with legitimate advertisers, the inclusion of a "quality" component ultimately increases Meta's scam-ad revenue, the likelihood that scam ads reach consumers on Meta platforms, or both. While Meta's process for determining the "quality" component of a bid is not transparent, only two possibilities exist: either (1) Meta is assigning scam ads zero or negative quality value, reflecting that scam ads lack relevance, good flow, or other features that would enhance the experience of Meta users, or (2) Meta is rewarding scam ads with a positive quality value. If Meta assigns scam ads zero or negative quality value, Meta is effectively determining that they are scams but choosing nonetheless to run those ads if the scammers bid higher prices (e.g., to outbid a legitimate ad assigned a quality value of $3, a scammer whose ad has $0 quality value must increase the financial component of their bid by more than $3). This acceptance of scam advertisers' bids, of course, boosts Meta's profits. Conversely, if Meta instead assigns scam ads positive quality value, Meta is increasing scammers' total bids and thereby raising the likelihood that scam ads will be shown to consumers. Whether the quality value Meta assigns to a particular scam ad is zero, negative, or positive, the net impact across Meta platforms of permitting millions of scam advertisers to participate in the auction process is a significant increase in Meta's advertising revenues.

75. By design, each aspect of Meta's ad auction process increases its bottom line—all the more when more advertisers, especially scam advertisers, participate. By bidding in Meta's ad auctions, scam advertisers drive up the financial bids placed by legitimate advertisers and therefore the price of placing legitimate ads. In addition, however Meta treats the quality component of a scam advertiser's bid, that decision ultimately extracts higher financial bids from scam advertisers, requires

[69] *About ad auctions*, Meta, https://www.facebook.com/business/help/430291176997542?id=561906377587030 (last visited Sep. 3, 2026).

legitimate advertisers to make higher financial bids than they otherwise would to remain competitive against scammers, or both. Through its ad auction process, Meta thus facilitates and promotes scam ads, all while legitimate advertisers edged out by scam advertisers—and later consumers exposed to scam ads—pay the price.

**5. Defendants Fail to Respond to Scams Reported by Users and Government Regulators or Identified by Their Own Staff**

76. On top of negating scam-prevention measures, letting scam advertisers bid for ad placement, and thereby flooding its platforms with scam ads, Meta also fails to remove ads flagged by users and even its own staff.

77. Despite their ubiquity and the risks to consumers, Meta deems scam ads a "low severity" problem that merely results in a poor "user experience."[70] Those same documents reportedly confirm both Meta's "lack of investment" in scam detection, as mentioned above, and Meta's direction to staff to narrowly focus on "fraudsters masquerading as celebrities and usurping major brands" because those "impersonation scams" risk upsetting public figures and might impact advertising revenue.[71]

78. Not coincidentally, then, Defendants roundly fail to address scams reported by their users. Most scam reports submitted by users of Facebook and Instagram go unresolved.[72] While users filed roughly 100,000 valid scam reports every week in 2023, Meta improperly rejected—or simply ignored—96 percent of such reports.[73]

79. Meta users of all kinds have reported scams to no avail. For example, a recruiter for the Royal Canadian Air Force filed multiple reports with Meta after her Facebook account was hacked and scammers began using an image of her to perpetrate a scam.[74] Meta took no action in response

[70] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*

to her reports, and at least five military colleagues of hers were ultimately defrauded of thousands of dollars because they trusted that they were dealing with someone they knew, rather than scammers.[75]

80. Meta has also ignored scam reports from law enforcement. When Singapore police provided Meta with a list of 146 examples of scams targeting Meta users, Meta determined that, while about a quarter of the ads violated Meta's express policies, the remainder "violate the spirit of the policy, but not the letter." [76] The scams that Meta concluded did not violate its fraud policies, and which Meta did not address, included deceptive ads offering 80-percent discounts on a designer fashion brand, fake concert tickets, and ads for jobs posted by scammers impersonating major corporations.[77]

81. This determination—that a scam ad can "violate the spirit of the policy, but not the letter"—highlights that Meta controls the definition of "fraud" on its platforms. Meta can manipulate its purported success in combating fraud—and misstate its commitment to doing so—by defining common scams as being non-fraudulent. For example, Meta evaluated crypto ads purportedly posted by the Prime Minister of Canada, concluding that these ads would not be flagged under Meta's advertising policies.[78]

82. Meta even refuses to promptly remove scammers that Meta's systems and employees have identified as violating its policies. According to a 2025 *Reuters* investigation, more than six months after a Meta employee's profile of the "Scammiest Scammers," two such scammers remained active on Meta platforms.[79]

83. According to a 2024 internal document, Meta would not remove certain scam advertisers until they had accrued "between eight and 32 automated 'strikes' for financial fraud," or "between four and 16 strikes" where Meta employees "personally escalate the problem."[80] As Meta employees told *The Wall Street Journal*, "Meta is reluctant to add impediments for ad-buying clients

[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.

who drove a 22% increase in its advertising business last year to over $160 billion. Even after users demonstrate a history of scamming, Meta balks at removing them."[81] In fact, scammers that generated significant advertising revenue—labeled "High Value Accounts" by Meta—could remain on Meta platforms even after being flagged for promoting scams over 500 times.[82]

84. Further, even when Meta does respond to scam reports, it often takes down individual ads rather than banning the accounts that publish them. And, Meta is slow to act even when it learns that ads it affirmatively verified and authorized turn out to be scams.

85. For example, Meta requires political advertisers to undergo a "special authorization process" that purports to verify "authenticity and legitimacy."[83] The Tech Transparency Project ("TTP") found that Meta expressly approved 63 scam advertisers that collectively ran more than 150,000 political ads, for which they spent $49 million on Facebook and Instagram.[84] Many of these ads used deepfake videos of President Trump, Elon Musk, Senators Bernie Sanders and Elizabeth Warren, Representative Alexandria Ocasio-Cortez, and White House Press Secretary Karoline Leavitt to sell fictitious government benefits, fake stimulus checks, and fraudulent investment products.[85]

86. By affirmatively approving these scam advertisers, Meta conferred on them a veneer of legitimacy. After approving them, Meta allowed these advertisers to run scam ads for days or weeks before taking any enforcement action.[86] Even after Meta had removed individual ads for violating its "unacceptable business practices" policy (discussed below), nearly half of those advertisers (30 of 63) continued to run advertisements, with six such accounts paying Meta over $1 million each before being disabled.[87] One advertiser, "Senior Health Daily USA," ran 59 identical versions of the same scam ad; Meta removed more than three quarters of them but continued to allow

---

[81] *Id.*

[82] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[83] *Meta Awash in Deepfake Scam Ads*, Tech Transparency Project (Oct. 1, 2025), https://www.techtransparencyproject.org/articles/meta-awash-in-deepfake-scam-ads.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

the advertiser to re-upload the same ad. TTP concluded that "Meta is allowing this activity even though it prohibits scams and says it invests in scam prevention to keep users safe."[88]

87. As the foregoing examples illustrate, scam reports—whether made by Meta users, government actors, or Meta staff—are in many cases a futile enterprise. Meta systematically fails to address them in a prompt or meaningful way.

### C. Defendants Materially Contribute to the Creation, Optimization, and Targeting of Scam Ads

88. The proliferation of scams on Facebook and Instagram is not simply the result of Defendants looking the other way or failing to adequately police fraud. To the contrary, Defendants actively participate in, assist, and encourage the creation, placement, and targeting of scam ads. Through its AI tools, for example, Meta participates directly in the design and editing of scam ads in ways that vastly enhance the effectiveness of the fraud, while reducing the costs to scammers. Meta also affirmatively facilitates scam advertising by promoting and providing special protections to supposedly "vetted" business partners that make no secret of offering services to support scam advertisers. And Meta uses its algorithms and other technology to target scam ads to vulnerable users who are most likely to engage with them. In these ways, among others, Defendants contribute to and enhance the production of scams on its platforms.

#### 1. Defendants Create, Modify, and Optimize Scam Ads Through Proprietary Tools, Including Artificial Intelligence

89. Meta offers AI tools that improve the scam ads themselves. These AI tools generate text, enhance images, determine target audiences, and can create and push out ads with unprecedented efficiency.[89] Meta knows, or reasonably should know, that these tools can aid scammers in creating and optimizing misleading ads, accelerating and expanding their distribution, and increasing consumer engagement with scams. Worse still, Meta's AI tools can even make ads more misleading.

---

[88] *Id.*
[89] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

90. Meta offers advertisers a host of specific tools, many of which leverage advanced artificial intelligence, to help advertisers create, refine, and improve their ads. For example, among many other AI products, Meta's "Advantage+ creative" tool helps advertisers—including scammers—create, refine, and improve their ads:

> When you turn on Advantage+ creative in Meta Ads Manager and Meta Business Suite, your images and videos are optimized to versions your audience is more likely to interact with. . . . Enhancements to images and videos may vary depending on who they are shown to and which optimization is used to improve ad performance. The media and text you upload may be adjusted to help improve ad performance while maintaining the core message of your campaign. If the branding feature is on, we'll try to use your brand preferences in some enhancements.[90]

91. Advantage+ creative can improve ads, and make users more likely to engage in them, by adding AI-generated images, animation, backgrounds, music, and video effects, or simply by improving ad quality by adjusting brightness and contrast or touching up images. The tool will even draft and manipulate the language used in ads. Meta offers that Advantage+ creative provides both "Text generation (AI)" and "Text improvements (AI)," as follows:

> Text generation is a generative AI feature available in Meta Ads Manager, Facebook Page and Meta Business Suite. The text generation feature allows you to create diverse text variations that could help create stronger customer resonance. The feature can generate up to 5 variations of primary text and headline, and you can generate text variations using personas. If the branding feature is on, we'll try to use your brand preferences in some enhancements.
>
> Text improvements is a generative AI feature designed to surface key information about your ad upfront and enable people to better understand your key selling points. When you toggle on this feature, keywords and phrases will be taken from your original ad copy and displayed directly or adjusted to fit better on or around your ad creative, such as text overlays, footers, prominent headlines and more.[91]

92. By default, Advantage+ is enabled for all Meta ad lead campaigns.

93. Advantage+ creative and similar tools can also make ad creation more efficient. Meta provides a "bulk edit" feature so that advertisers—including scammers—can use Meta's powerful tools to enhance multiple ads simultaneously.[92] Another Meta tool, "Dynamic ads," enables

---

[90] *About Advantage+ creative*, Meta, https://www.facebook.com/business/help/297506218282224?id=649869995454285 (last visited Sep. 3, 2026).

[91] *Id.*

[92] *Bulk edit Advantage+ creative enhancements in Meta Ads Manager*, Meta, https://www.facebook.com/business/help/691986150075749 (last visited Sep. 3, 2026).

advertisers "to automatically promote your entire product catalog across Facebook, Instagram and Audience Network without having to create thousands of individual ads. Dynamic ads capture the intent signals that customers show on websites and apps to ensure the right products are connected to the right people."[93]

94. In addition to Advantage+, Meta also offers an "Ads Manager" tool, which it describes as "an all-in-one tool for creating ads, managing when and where they'll run, and tracking how well your campaigns are performing towards your marketing goals."[94] Meta touts that advertisers can use Ads Manager "to create ads from existing posts published on your Facebook Pages."[95] Using that tool, advertisers—including scammers—can specify their ad objective, including options such as engagement "to create ads that click to message," "ads that send people to an online destination," "app ads," and "call ads" and leads "to create ads that send people to an online destination," "app ads," and "call ads."[96] Ultimately, having Meta generate an ad from an existing post on platforms such as Meta and Instagram is as simple as using "the dropdown menu to select Use existing post" and then "[s]elect[ing] the post you want to use to create an ad."[97]

95. Meta not only provides tools for advertisers to create their own ads, but will create ads itself with elements provided by the advertiser, using a tool called "dynamic creative." Meta explains: "When you use dynamic creative in Meta Ads Manager, you can upload multiple creative elements, like images and headlines, which are automatically combined to generate different ad variations for your audience."[98]

96. Another Meta tool, the "flexible ad format," will also create ads using Meta's own data analysis to determine which ad components will appeal to which users:

---

[93] *Dynamic Ads Guide*, Meta, https://www.facebook.com/business/m/one-sheeters/dynamic-ads (last visited Sep. 3, 2026).
[94] *Ads Manager – Meta for Business*, Meta, https://www.facebook.com/business/tools/ads-manager (last visited Sep. 3, 2026).
[95] *How to create ads from existing posts in Meta Ads Manager*, Meta, https://www.facebook.com/business/help/374756690038600?id=649869995454285 (last visited Sep. 3, 2026).
[96] *Id.*
[97] *Id.*
[98] *About Dynamic Creative*, Meta, https://www.facebook.com/business/help/170372403538781 (last visited Sep. 3, 2026).

> The flexible ad format is designed to help you automatically optimize your ad format to show people what we predict they're most likely to respond to based on the specific placement and audience. When you select Flexible as your ad format, you can select up to 10 images and videos in a single ad campaign, and the ad delivery system will automatically determine what media or media combination, such as single image, video or carousel, to show to people.[99]

97. Meta has offered AI tools that generate advertising text and enhance ads since at least 2023. For example, Search Engine Land announced in October 2023 that "Meta's first generative AI-powered tools for advertisers are here" and described the Meta tools "designed to maximize productivity, personalization and performance."[100] These included: a background-generation tool that "creates multiple backgrounds to complement the advertiser's product images"; an image-expansion tool to more efficiently "adjust creative assets" for different formats; and a text-variation tool used "to generate multiple versions of ad texts based on their original copy, and to highlight the selling points of their products/services."[101]

98. The website for Core, a marketing communications company, discussed Meta's 2023 announcement, noting that Meta "has been pushing advertisers to test out its AI-based ad creation elements, with these features becoming more integrated into the ad setup process than ever before."[102] Core explained that "more than 4 million Meta advertisers are now using at least one of the tech firm's generative AI tools."[103]

99. Indeed, the number of advertisers using Meta's tools to generate ads is massive and growing. In December 2024, Meta touted, "Even at this early stage, more than a million advertisers used our generative AI (GenAI) tools to create more than 15 million ads in a month."[104]

---

[99] *About the Flexible Ad Format*, Meta, https://www.facebook.com/business/help/835561738423867 (last visited Sep. 3, 2026).

[100] Nicola Agius, *Meta's first generative AI-powered tools for advertisers are here*, Search Engine Lane (Oct. 4, 2023), https://searchengineland.com/meta-generative-ai-powered-tools-advertisers-432827.

[101] *Id*.

[102] *Meta's push into Generative AI ad creation*, Core, https://www.onecore.ie/intel/metaai (last visited Aug. 26, 2026).

[103] *Id*.

[104] *Meta Andromeda: Supercharging Advantage+ automation with the next-gen personalized ads retrieval engine*, Meta, (Dec. 2, 2024), https://engineering.fb.com/2024/12/02/production-engineering/meta-andromeda-advantage-automation-next-gen-personalized-ads-retrieval-engine/.

100. As Meta knows or reasonably should know given its extensive tracking of scam-ad volume on its platforms, these powerful AI tools can be used by scammers to create, improve, and increase consumer engagement with scam ads. But even worse, Meta's tools can make problematic ads even more misleading.

101. *Reuters* tested Meta's AI features by attempting to create a scam ad on Meta's platforms. According to the article detailing his experience, "Meta's AI systems offered to improve a *Reuters* reporter's advertisements touting investment returns that were too good to be true."[105] That article included the below sample image of Advantage+, which states that "[y]ou can generate images with AI to add more media to your ad. We'll show the images when it's likely to help improve performance."[106]




102. The reporter further detailed his experience having Advantage+ materially modify and improve his scam ads to increase user engagement:

> A feature called Advantage+ used AI to generate alternates of my ads that might be more enticing. Meta Chief Executive Mark Zuckerberg earlier this year noted how effective such tools could be. "We're gonna be able to come up with, like, 4,000 different versions of your creative and just test them and figure out which one works best," he told an audience at a San Francisco conference in May.

---

[105] Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, Reuters (Dec. 15, 2025), https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.
[106] *Id.*

> In my case the system suggested 10 variants that featured new visuals, including AI-generated people of different ethnicities. It also suggested different text: "Tired of living paycheck to paycheck?" one asked. "Break the cycle and start earning a steady weekly income with our proven system."
>
> Instead of asking me to choose one, Meta suggested I authorize all of the alternates. Its platform would then test each variant, directing my money to those that performed best. I declined. My ads felt scammy already, and some of the claims featured in Meta's ads violated Reuters policy against making false statements. [107]

103. Meta, too, knows that its AI tools may generate misleading content. In the terms governing use of its generative AI tools, Meta acknowledges that use of those tools may result in output that is "inaccurate, incomplete, misleading, offensive, and/or inappropriate" and disclaims any warranties regarding the accuracy and reliability of such outputs. Meta also purports to wash its hands of any liability associated with use of its AI-generated content—while simultaneously asserting ownership rights over the (potentially misleading or inaccurate) advertising outputs created by its generative AI products.[108]

104. That Meta's own systems assist in creating, refining, and optimizing deceptive ads—the content of which Meta purports to own, at least in part—means that Meta itself not only gives a platform to scams and intentionally limits its efforts to prevent fraud, but actively contributes to the creation and development of scam ads that target its own users.

**2. Defendants Steer Fraudulent Ads to the Most Vulnerable Victims**

105. Defendants use algorithms and other advanced, AI-driven technology to select which advertisements are shown to which users. Those algorithms take into account the ads that a given user has previously engaged with, including by clicking on those ads. Accordingly, as Meta itself has recognized, a user who clicks on a scam ad is more likely to be shown additional scam ads because Meta itself will select those ads for that user.

106. Meta has long touted its ability to select which users will be shown which ads. For example, in 2018, CEO Mark Zuckerberg testified before U.S. Senate committees that:

---

[107] Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, Reuters (Dec. 15, 2025), https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.

[108] *Ad Creative Generative AI Terms* at ¶ 3, Meta, (May 6, 2024), https://www.facebook.com/legal/terms/ad_creative_generative_ai_terms.

> What we allow is for advertisers to tell us who they want to reach, and then we do the placement. So, if an advertiser comes to us and says, all right, I am a ski shop and I want to sell skis to women, then we might have some sense, because people shared skiing-related content, or said they were interested in that. They shared whether they are a woman, and then we can show the ads to the right people.[109]

107. Internal Meta documents "further note that users who click on scam ads are likely to see more of them because of Meta's ad-personalization system, which tries to deliver ads based on a user's interests."[110]

108. Among the powerful tools Meta touts to advertisers to enhance their advertising campaigns is its AI-driven "Andromeda" tool that selects which ads to show individual users. Meta has described the benefits Andromeda provided in targeting ads to specific users:

> AI plays an important role in Meta's advertising system by leveraging the power of machine learning (ML) to predict which ads a person will find most interesting. This helps people learn about a business or product they are interested in while helping an advertiser meet their objectives such as increasing brand awareness, acquiring new customers, and driving sales.
>
> Retrieval is the first step in our multi-stage ads recommendation system. This stage is tasked with selecting ads from tens of millions of ad candidates into a few thousand relevant ad candidates. In the following stage, larger and more sophisticated ranking models predict people and advertiser value *to determine the final set of ads to be shown to the person*.[111]

109. Meta further stresses that "Andromeda improves performance of Meta ads system by delivering more personalized ads to viewers and maximizing return on ad spend for advertisers."[112]

110. A November 2025 post by Meta described an even more advanced Meta tool for directing ads to particular users, Meta's "Generative Ads Model" or "GEM," which Meta described

---

[109] *Facebook, Social Media Privacy, and the Use and Abuse of Data*, Before the Senate Comm. on Commerce, Science, and Transp. and Senate Comm. on the Judiciary, 150th Congress (2018), https://www.govinfo.gov/content/pkg/CHRG-115shrg37801/html/CHRG-115shrg37801.htm.

[110] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[111] *Meta Andromeda: Supercharging Advantage+ automation with the next-gen personalized ads retrieval engine*, Meta (Dec. 2, 2024), https://engineering.fb.com/2024/12/02/production-engineering/meta-andromeda-advantage-automation-next-gen-personalized-ads-retrieval-engine/ (emphasis added).

[112] *Id.*

as "The Central Brain Accelerating Ads Recommendation AI Innovation."[113] The post provided an in-depth discussion of how GEM directed ads to the users that advertisers most want to target. Among other things, the post explains that GEM is able to "learn from a much longer history of user organic and ad interactions," and thus can "more effectively uncover patterns and relationships, resulting in a deeper and more accurate understanding of the user's purchase journey."[114]

111. The post concluded by naming GEM "The Future of Foundation Models for Ads Recommendations," which it explained as follows: "The future of ads recommendation systems will be defined by a deeper understanding of people's preferences and intent, making every interaction feel personal. For advertisers, this translates into one-to-one connections at scale, driving stronger engagement and outcomes."[115]

112. These technologies learn from users' history of engagement with ads and other content, and they use that knowledge to rank and choose ads to display to individual users, with the aim of increasing "ad conversions" (e.g., purchases, sign-ups). Accordingly, Defendants are more likely to show a scam for nutritional supplements to a user who has engaged with fraudulent content related to nutritional supplements and are more likely to show a scam related to cryptocurrency to a user who has engaged with fraudulent content related to cryptocurrency.

113. The technology Meta uses to target and facilitate scams in this way has grown increasingly powerful. Reporting on Meta's use of AI tools in digital advertising, *The New York Times* explained that "the real business breakthroughs have come from targeting" because Meta "is collecting deeper insights into users' interests, which improves the companies' ability to target ads.[116] And it is reducing advertising costs, which frees up money for bigger campaigns." While "[i]t used to be that an advertiser would say, for example, 'I want to target women in New York between the

[113] *Meta's Generative Ads Model (GEM)*, Meta, (Nov. 10, 2025), https://engineering.fb.com/2025/11/10/ml-applications/metas-generative-ads-model-gem-the-central-brain-accelerating-ads-recommendation-ai-innovation/.
[114] *Id.*
[115] *Id.*
[116] Tripp Mickle & Eli Tan, *Behind the A.I. Boom, a Boring Business is Soaring With Better Ads*, N.Y. Times (Apr. 29, 2026), https://www.nytimes.com/2026/04/29/technology/ai-artificial-intelligence-ad-boom.html.

ages of 24 and 35.' Now it's the opposite: Meta . . . [is] using A.I. to recommend customers the brands should be going after."[117]

114. By leveraging this advanced technology to direct scam ads to the users most likely to be taken in by those ads, Meta is engaging in the scam, not acting merely as a passive publisher of advertisements, and enabling scammers to reach more people, more quickly and cheaply, who are more likely to be deceived.

### D. Defendants Deceive Plaintiffs and Members of the Classes and Break Their Contractual Obligations to Prioritize Safety, Security, and Scam Prevention

#### 1. Defendants' Contractual Promises to Plaintiffs and the Classes

115. Meta provides Terms of Service (the "Facebook Terms"), formerly referred to as a Statement of Rights and Responsibilities, that apply to Facebook and certain other Meta platforms that constitute a contract with the users of those platforms. Meta and Instagram also maintain a separate contract with Instagram users, the Instagram Terms of Use (the "Instagram Terms"), which applies to Instagram. Both the Facebook Terms and the Instagram Terms incorporate as part of the contract related Meta policies and terms, including, but not limited to, Meta's Community Standards. The Facebook Terms also incorporate the Advertising Policies.

##### a) Facebook Terms of Service

116. Section 1 of the Facebook Terms—titled "The services we provide." In this Section, Meta explains that it shows Facebook users ads:

> **1.4 Help you discover content, products and services that may interest you:** We show you personalized ads, offers and other sponsored or commercial content to help you discover content, products and services that are offered by the many businesses and organizations that use Facebook and other Meta Products.[118]

117. In the same section, Meta promises to promote safety and integrity, monitor and remove harmful content, and keep users safe:

> **1.5 Promote the safety, security and integrity of our services, combat harmful conduct and keep our community of users safe:** People will only build community on Meta Products if they feel safe and secure. We work hard to maintain the security

---

[117] *Id.*
[118] *Terms of Service Overview*, Meta (Effective from Jan. 1, 2025), https://www.facebook.com/terms?section_id=0_overview.

> (including the availability, authenticity, integrity and confidentiality) of our Products and services. We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct such as this, we may take appropriate action based on our assessment that may include notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account or contacting law enforcement. We share data across Meta Companies when we detect misuse or harmful conduct by someone using one of our Products or to help keep Meta Products, users and the community safe.[119]

118. The Facebook Terms promise that Meta will "[u]se and develop advanced technologies to provide safe and functional services for everyone," including "develop[ing] automated systems to improve [Meta's] ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of [Meta's] Products.[120]

119. Moreover, Section 3 of the Facebook Terms—titled "Your commitments to Facebook and our community"— provides, in relevant part:

> We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments:
>
> . . .
>
> 3.2 What you can share and do on Meta Products
>
> We want people to use Meta Products to express themselves and to share content that is important to them, but not at the expense of the safety and well-being of others or the integrity of our community. You therefore agree not to engage in the conduct described below (or to facilitate or support others in doing so):
>
> 1. You may not use our Products to do or share anything:
>
> • That violates these Terms, the Community Standards, or other terms and policies that apply to your use of our Products.
>
> • That is unlawful, misleading, discriminatory or fraudulent (or assists someone else in using our Products in such a way).[121]

120. Additionally, Section 5 of the Facebook Terms—titled "Other terms and policies that may apply to you"—links to Meta's "Advertising Policies" which purport to "specify what types of

[119] *Id.*
[120] *Id.*
[121] *Id.*

ad content are allowed by partners who advertise across the Meta Products."[122] This policy prohibits ads which promote "products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information."[123]

**b) Instagram Terms of Use**

121. Section 1 of the Instagram Terms, in relevant part, provides that:

> We develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive, including when we think they might need help. We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have-including your information-to try to keep our platform secure.[124]

122. Section 6 of the Instagram Terms also provide: "We can remove any content or information you share on the Service if we believe that it violates these Terms of Use, our policies (including our Community Standards), or we are permitted or required to do so by law."[125]

123. The Instagram Terms further state:

> We use data from Instagram and other Meta Company Products, as well as from third-party partners, to show you ads, offers, and other sponsored content that we believe will be meaningful to you. And we try to make that content as relevant as all your other experiences on Instagram. . . . [W]e show you relevant and useful ads. . . . Automated technologies also help us ensure the functionality and integrity of our Service.[126]

**c) Community Standards (Incorporated by Reference)**

124. The Facebook Terms and Instagram Terms refer users to a number of webpages that provide a host of terms governing the contracts. Among other things, those webpages commit Meta to preventing fraudulent ads and other scams on its platforms, and to removing ads and other content that violate its policies and standards.

---

[122] *Id.*
[123] *Introduction to the Advertising Standards*, Meta, https://transparency.meta.com/policies/ad-standards/?fbclid=IwY2xjawSLw2xleHRuA2FlbQIxMABicmlkETFRRWlSOE1PUVRFM2hCN2xYc3J0YwZhcHBfaWQQMjIyMDM5MTc4ODIwMDg5MgABHjGEdLZQruTGE36ElrVEUquevxtkcfe3UzJsdnfCzoC9r_DVFZK8AHJ008LQ_aem_7YVIXESkHjU19mw6zZ0dnw (last visited Sep. 3, 2026).
[124] *Terms of Use*, Instagram, https://help.instagram.com/termsofuse (last visited Sep. 3, 2026).
[125] *Id.*
[126] *Id.*

125. Meta's Community Standards, which are incorporated by reference into both the Facebook Terms and Instagram Terms, promise that "when we limit expression, we do it in service of one or more of the following values," which include: "**Authenticity:** We want to make sure that the content people see is authentic. We believe that authenticity creates a better environment for sharing, and that's why we don't want people using our services to misrepresent who they are or what they're doing".[127]

126. Meta commits that "Our Community Standards apply to everyone, all around the world and to all types of content, including AI-generated content."[128] Among other content prohibited by the Community Standards are "Fraud, Scams, and Deceptive Practices." Under that heading, Meta expressly prohibits ads that attempt "to scam or defraud users by misrepresenting the identity of the poster," including by "falsely claiming to represent, or speak in the voice of, an established business or entity," and represents that "We do not allow: Content that attempts to scam or defraud users and/or businesses."[129] Meta expounds upon those commitments as follows:

> We aim to protect users and businesses from being deceived out of their money, property or personal information. We achieve this by removing content and combatting behavior that purposefully employs deceptive means – such as wilful misrepresentation, stolen information and exaggerated claims – to either scam or defraud users and businesses, or to drive engagement. This includes content that seeks to coordinate or promote those activities using our services.[130]

127. Meta explains that it will "restrict or remove accounts that are harmful to the community. We have built a combination of automated and manual systems to restrict and remove accounts that are used to egregiously or persistently violate our policies across any of our products."[131] With regard to scams and frauds, Meta makes express commitments to users:

> We do not allow content that is designed to deceive, mislead or overwhelm users in order to artificially increase viewership. This content detracts from people's ability to

[127] *Community Standards*, Meta, https://transparency.meta.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards (last visited Sep. 3, 2026).
[128] *Id.*
[129] *Fraud, scams and deceptive practices*, Meta, https://transparency.meta.com/policies/community-standards/fraud-and-scams/ (last visited Sep. 3, 2026).
[130] *Id.*
[131] *Account Integrity*, Meta, https://transparency.meta.com/policies/community-standards/account-integrity/ (last visited Sep. 3, 2026).

> engage authentically on our platforms and can threaten the security, stability and usability of our services. We also seek to prevent abusive tactics, such as spreading deceptive links to draw unsuspecting users in through misleading functionality or code, or impersonating a trusted domain.
>
> Online spam is a lucrative industry. Our policies and detection must constantly evolve to keep up with emerging spam trends and tactics. In taking action to combat spam, we seek to balance raising the costs for its producers and distributors on our platforms, with protecting the vibrant, authentic activity of our community.[132]

128. The Community Standards provide that Defendants "aim to protect users and businesses from being deceived out of their money, property or personal information." To that end, Defendants "remov[e] content and combat[] behaviour that purposefully employs deceptive means - such as wilful misrepresentation, stolen information and exaggerated claims - to either scam or defraud users and businesses, or to drive engagement."[133]

129. Those Community Standards (discussed more fully below) are hyperlinked to a page that provides more detail on Meta's Community Standards including those that apply to "Fraud, Scams, and Deceptive Practices."

130. Meta's "Fraud, Scams, and Deceptive Practices" policy states that Defendants "aim to protect users and businesses from being deceived out of their money, property or personal information." To that end, Defendants "remov[e] content and combatting behaviour that purposefully employs deceptive means - such as wilful misrepresentation, stolen information and exaggerated claims - to either scam or defraud users and businesses, or to drive engagement."[134]

**d) Advertising Policies**

131. Defendants' contracts with Plaintiffs and members of the Classes also include express provisions, designated "Advertising Policies," that detail the categories of advertisements that are prohibited on Meta's platforms. Specifically, Meta represents that "Our Advertising Standards provide policy detail and guidance on the types of ad content we allow, and the types of ad content

---

[132] *Spam*, Meta, https://transparency.meta.com/policies/community-standards/spam/ (last visited Sep. 3, 2026).

[133] *Fraud, scams and deceptive practices*, Meta, https://transparency.meta.com/policies/community-standards/fraud-and-scams/ (last visited Sep. 3, 2026).

[134] *Id.*

we prohibit." Meta's advertising policies "are guided by our company's core values and the following principles":

> **PROTECTING PEOPLE FROM FRAUD OR SCAMS:** Our policies prohibit ads promoting products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information.
>
> **PROMOTING TRANSPARENCY:** We strive to make advertising more transparent and to give people more information about the ads that they see. Our Ad Library offers a view of all ads currently running across our apps and services.
>
> **Enforcement of our policies:** We use automated and, in some instances, manual review to enforce our policies. Beyond reviewing individual ads, we also monitor and investigate advertiser behavior, and may restrict advertiser accounts that don't follow our Advertising Standards, Community Standards or other Meta policies . . .
>
> Ads must not violate our Community Standards.[135]

132. Meta's Advertising Standards include a separate "Unacceptable Business Practices" policy that provides: "Ads must not promote products, services, schemes or offers using identified deceptive or misleading practices, including those meant to scam people out of money or personal information." That policy also includes Meta's "Guidelines for Ads," which provides that:

> Ads can't:
>
> Use deceptive or exaggerated claims about the success of a product or service to mislead people into purchasing or sharing sensitive information
>
> Use deceptive or exaggerated claims about health-related benefits of a product or service to mislead people into purchasing or sharing sensitive information
>
> Use the image of a famous person and misleading tactics in order to bait people into engaging with an ad
>
> Promise financial benefits by misrepresenting an entity, industry association or news outlet to mislead people or ask them to share sensitive information[136]

133. Meta concludes its "Unacceptable Business Practices in Advertising" policy by promising that, with regard to "scams," "we take a comprehensive approach to making our technologies a safer place."[137]

---

[135] *Introduction to the Advertising Standards*, Meta, https://transparency.meta.com/policies/ad-standards/ (last visited Sep. 3, 2026).
[136] *Unacceptable business practices*, Meta, https://transparency.meta.com/policies/ad-standards/fraud-scams/unacceptable-business-practices/ (last visited Sep. 3, 2026).
[137] *Id.*

134. Meta also has an advertising policy on cryptocurrency products and services, the "Cryptocurrency Products and Services Policy", which applies to ads promoting (i) "cryptocurrency exchanges or trading platforms;" (ii) "cryptocurrency borrowing or lending;" (iii) "cryptocurrency wallets that offer additional services;" (iv) "cryptocurrency mining software;" and (v) "cryptocurrency investment."[138]

135. Meta's Cryptocurrency Products and Services Policy provides that:

> Ads may not promote cryptocurrency trading platforms, software and related services and products that enable monetisation, reselling, swapping or staking of cryptocurrencies without prior written permission.[139]

136. Meta purports to subject ads that "promote the trading of cryptocurrency or related products and services" to certain eligibility requirements to "help [Meta] identify advertisers who are legitimate and use safe cryptocurrency advertising practices."[140]

137. According to Meta, advertisers seeking to place ads promoting trading cryptocurrency and related products and services must apply so that Meta may authorize them to do so.[141] This application process includes, *inter alia*, the submission of details of the advertiser's business and submitting proof of "relevant cryptocurrency license or regulatory certification."[142]

138. To obtain permission to promote cryptocurrencies via Meta Ads, advertisers must submit details about their business to Meta, along with cryptocurrency licenses and/or regulatory certifications. Meta purportedly maintains this policy because crypto is "highly prone to financial scams and misleading advertising." Thus, those seeking to advertise crypto and related services must "provide evidence that their activities are appropriately licensed." [143]

[138] *About Meta's advertising policy on cryptocurrency products and services*, Meta, https://www.facebook.com/business/help/438252513416690?id=595195347635322 (last visited Sep. 3, 2026); *Cryptocurrency products and services*, Meta, https://transparency.meta.com /policies/ad-standards/restricted-goods-services/cryptocurrency-products-and-services (last visited Sep. 3, 2026).

[139] *Id.*

[140] *About Meta's advertising policy on cryptocurrency products and services*, Meta, https://www.facebook.com/business/help/438252513416690?id=595195347635322 (last visited Sep. 3, 2026).

[141] *Id.*

[142] *Id.*

[143] *Cryptocurrency products and services*, Meta, https://transparency.meta.com/policies/ad-standards/restricted-goods-services/cryptocurrency-products-and-services (last visited Sep. 3, 2026).

139. Moreover, Meta states that it engages in a two-part review process for cryptocurrency ads:

> ### How we review cryptocurrency ads
>
> The review process for ads related to cryptocurrency involves 2 parts:
>
> - **Ad review:** Our ad review system identifies whether the ads are within the scope of the cryptocurrency ads policy.
> - **Ad account review:** When we identify that an ad is within scope, we check to see if the associated ad account has been approved to advertise cryptocurrency products and services.
>
> Your ad violates our policy if it's within the scope of the policy and your associated ad account hasn't been approved for cryptocurrency. Note that your ads must also not promote products prohibited in our Fraud, Scams and Deceptive Practices or Financial and Insurance Products and Services policies.

**2. Defendants Have Breached Their Contracts with Plaintiffs and Members of the Classes**

140. Defendants have breached these contracts by failing to make good on their promises to take meaningful action to combat scams and protect consumers and legitimate advertisers from deceptive ads. Despite Meta's contractual promises that it will take a "comprehensive" approach to platform safety, maintain teams and systems to fight scams, and take action to address misleading advertising, Meta has prioritized its own profits and failed to adopt and maintain meaningful systems to prevent and remove the scam ads that Meta knows to be rife on its platforms.[144]

141. As explained below in connection with Defendants' other public representations, Defendants track their "violating revenue" streams and prohibit their scam prevention teams from cutting too much into Meta's bottom line by setting "revenue guardrails."[145] Rather than maintaining the "dedicated teams"[146] it promises, Defendants have laid them off. And rather than reviewing "every

[144] *Unacceptable business practices*, Meta, https://transparency.meta.com/policies/ad-standards/fraud-scams/unacceptable-business-practices/ (last visited Sep. 3, 2026).
[145] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters, (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.
[146] *Terms of Service Overview*, Meta (effective from Jan. 1, 2025), https://www.facebook.com/terms/.

ad,"[147] Meta posts ads it knows are likely to be fraudulent if the scam advertiser pays an extra surcharge. Meta uses its ad-targeting ability—which it contractually promises will connect users with content that interests them—to instead direct scam ads toward the consumers most likely to be harmed by them, including elderly users targeted with elder-fraud scams. As such, Defendants have breached their contracts with consumers and violated the covenant of good faith and fair dealing implied by law into every contract.

### 3. Defendants' Extracontractual Representations That They Will Prevent Scams on Their Platforms

142. In addition to their contractual promises, Defendants have made, and continue to make, a wide range of public statements related to their efforts to combat scam advertising. These statements are false, misleading, and likely to deceive Plaintiffs and members of the Classes.

#### a) Meta Falsely Claims that Fraud Prevention is a Top Priority

143. Meta characterizes protecting consumer safety by combating scam ads as a top priority that it pursues "aggressively."[148]

144. A December 2025 Meta post entitled "Scams Are Bad for Business: Our Ongoing Efforts to Fight Fraud" described Meta's approach to scam reduction as "aggressive."[149]

145. Likewise, in its 2023, 2024, and 2025 annual reports, Meta states that it is making "significant investments in privacy, safety, security, and content and advertising review efforts" to combat "improper advertising practices."[150]

---

[147] *Testing New Ways to Combat Scams and Help Restore Access to Compromised Accounts*, Meta (Oct. 21, 2024), https://about.fb.com/news/2024/10/testing-combat-scams-restore-compromised-accounts/.

[148] *Scam Protection Center*, Meta, https://www.meta.com/safety/scam-protection-center/?srsltid=AfmBOoohiKbuUtr0SFPUGbu_l8DIqpB-LWLCFv8Ln0PwZ-YNdjcLy1rt (last visited Sep. 3, 2026); *Fighting Scammeras & Protecting People With New Technology & Partnerships*, Meta (Mar. 11, 2026), https://about.fb.com/news/2026/03/fighting-scammers-protecting-people-with-new-technology-and-partnerships/.

[149] *Scams Are Bad for Business: Our Ongoing Efforts to Fight Fraud*, Meta (Dec. 3, 2025), https://about.fb.com/news/2025/12/scams-are-bad-for-business-metas-efforts-to-fight-fraud/.

[150] Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 28, 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/b919eb05-86d9-4412-a8ff-308be1afb070.pdf; Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 1, 2024), https://s21.q4cdn.com/399680738/files/doc_financials/2023/ar/Meta-12-31-2023-10K-ARS.pdf; Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 29, 2025), https://s21.q4cdn.com/399680738/files/doc_financials/2024/ar/Meta-12-31-2024-10K-ARS.pdf.

146. And Meta executives have echoed this commitment to routing out fraud from Facebook and Instagram. In January 2025, Mark Zuckerberg represented to the public that although Meta would be making some changes to its content moderation practices in light of the 2024 election, Meta would "continue to focus" its systems on addressing what he called "high-severity violations" of Meta's policies, which he defined to include "fraud and scams."[151]

147. In November 2025, Meta spokesman Andy Stone assured members of the public: "We aggressively fight fraud and scams because people on our platforms don't want this content, legitimate advertisers don't want it and we don't want it either."[152]

148. Contrary to these representations, Meta prioritizes profits over safety. Despite making the above assurances, Meta tracks its "violating revenue" streams and prohibits its scam prevention teams from cutting too much into its bottom line by setting "revenue guardrails" that prohibit those teams from taking actions that could cost the company more than 0.15% of its revenue.[153] Rather than making significant investments into combating scam ads and treating them as a "high-severity" violation of Meta's policies, as it publicly vows, Meta's internal documents acknowledge a "lack of investment" in scam detection and deem scam ads a "low severity" problem that merely impacts "user experience."[154] And instead of living up to its public commitment to fight scam ads through "aggressive"[155] efforts, Meta welcomes these ads, charging scam advertisers a surcharge to post ads that Meta knows are likely to be fraudulent, misleading, or deceptive. On information and belief, Meta can even adjust the flood of scam ads it allows on its platforms to smooth its earnings or hit specific revenue targets.[156]

---

[151] Joel Kaplan, *More Speech & Fewer Mistakes*, Meta (Jan. 7, 2025), https://about.fb.com/news/2025/01/meta-more-speech-fewer-mistakes/.

[152] *US senators call for investigation of scam ads on Facebook & Instagram*, The Guardian (Nov. 24, 2025), https://www.theguardian.com/us-news/2025/nov/24/investigation-scam-ads-facebook-instagram.

[153] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[154] *Id.*

[155] *Id.*

[156] *Id.*

**b) Meta Falsely Claims that it Treats Fraud Prevention with Immediacy and Reliability**

149. Meta publicly characterizes its approach to removing scam ads and scam advertisers from its platforms, including Facebook and Instagram, as dependable and immediate.

150. Meta's "Unacceptable Business Practices in Advertising" policy, which is available publicly on Meta's Transparency Center webpage, states: "Advertisers can't run ads that promote products, services, schemes or offers that use identified deceptive or misleading practices, including scams to take money from people or access personal information. We do this to protect people from being taken advantage of by advertisers."[157]

151. Similarly, Meta's "Account Integrity" policy states: "[w]e restrict or remove accounts that are harmful to the community. We have built a combination of automated and manual systems to restrict and remove accounts that are used to egregiously or persistently violate our policies across any of our products."[158]

152. In the "Enforcement" section of the Transparency Center webpage, under the heading "Taking action," Meta represents: "We remove content that goes against our policies as soon as we become aware of it."[159] Likewise, under the heading "Taking down violating content," Meta states: "If your content goes against the Community Standards, Meta will remove it."[160] Under the heading "Our policies" on the Transparency Center webpage, Meta states: "Our policies define what is and isn't allowed on Meta technologies. If content goes against our policies, we take action on it."[161] Meta even states that it goes beyond removing content that clearly violates its policies by seeking to reduce the prevalence of "problematic content" that "doesn't quite meet the standard for removal under our

---

[157] *Unacceptable Business Practices*, Meta, https://transparency.meta.com/policies/ad-standards/fraud-scams/unacceptable-business-practices (last visited Sep. 3, 2026).

[158] *Account Integrity*, Meta, https://transparency.meta.com/policies/community-standards/account-integrity/ (last visited Sep. 3, 2026).

[159] *Taking action*, Meta, https://transparency.meta.com/enforcement/taking-action/ (last visited Sep. 3, 2026).

[160] *Taking down violating content*, Meta, https://transparency.meta.com/enforcement/taking-action/taking-down-violating-content/ (last updated Nov. 12, 2024).

[161] *Policies*, Meta, https://transparency.meta.com/policies/ (last visited Sep. 3, 2026).

policies."[162] According to Meta, "[t]his means that we remove harmful content that goes against our policies, reduce the distribution of problematic content that doesn't violate our policies."[163] Lastly, on its Scam Prevention Hub webpage, Meta states that its automated systems "often" ban scam accounts "without a recent user report. This means our automated systems are able to stop abuse even before it is reported."[164]

153. These representations assure Facebook and Instagram users, including Plaintiffs and members of the Classes, that Defendants are committed to taking proactive and swift action to detect and address scam ads. But Defendants' actual approach to removing scam ads and scam advertisers from their platforms is neither dependable nor immediate. As explained above, Meta eschews proactive scam detection measures, and worse still, it allows scam ads and scam advertisers to fester on its platforms for long periods even after receiving reports of fraud from users, government actors, and its own employees.

154. For example, in 2023, an internal Meta analysis found that Meta improperly rejected or ignored 96% of a sample of roughly 100,000 valid scam reports submitted by users.[165] And a 2024 internal Meta document reveals that Meta generally does not remove scam advertisers from its platforms until they accrue "between eight and 32 automated 'strikes'" for posting scam content.[166] Indeed, the document shows that Meta tracks the amount of advertising revenue a scam advertiser generates, and "High Value Accounts" can remain on Meta's platforms even after being flagged over 500 times.[167] Even the most egregious scammers stay on Meta's platforms long after Meta learns of

---

[162] *Taking action*, Meta, https://transparency.meta.com/enforcement/taking-action/ (last visited Sep. 3, 2026).

[163] *Transparency*, Meta, https://transparency.meta.com/ (last visited Sep. 3, 2026).

[164] *Policy enforcement*, Meta, https://www.meta.com/safety/scam-protection-center/safety-tips/policy-enforcement/?srsltid=AfmBOooDkE8X3zUxPfM1DJSObFdzKybrUKKL2wjxWRLRsjCOQB2z2v_e (last visited Sep. 3, 2026).

[165] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[166] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, Wall St. J. (May 15, 2025), https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8.

[167] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

their wrongdoing: a 2025 *Reuters* investigation found that more than six months after a Meta employee profiled the "Scammiest Scammers" on Meta's platforms, two such scammers remained active.[168]

**c) Meta Falsely Claims that it is "Constantly" Improving Fraud Prevention**

155. Defendants claim to be "constantly" improving the processes and technologies they use to combat scam advertising. On its Scam Prevention Hub webpage, Meta states: "[W]e are constantly working to improve ways of detecting and blocking accounts that purposely deceive, misrepresent, defraud and exploit people for money or property."[169]

156. Separately, in an October 2024 post, Meta stated: "Scammers are relentless and continuously evolve their tactics to try to evade detection, so we're building on our existing defenses by testing new ways to protect people and make it harder for scammers to deceive others."[170]

157. In December 2025, Meta told users that, as part of its "ongoing work" to combat scams, "we continue to deploy a range of product updates to bolster our detection efforts. For example, we're using the latest advancements in AI to help us detect scams, and . . . we're expanding our advertiser verification efforts to verify the authenticity of the people and organizations that run ads on our platforms." Meta explained: "The spike in scams is playing out across the internet. . . . No one likes it. Not the people who use our services. Not advertisers. And certainly not us. . . . Every day, we find new ways to stop and take them down." Meta assured users that its "continued development of new product features and tools helps protect individual accounts and legitimate businesses against scams."[171]

---

[168] *Id.*

[169] *Policy enforcement*, Meta, https://www.meta.com/safety/scam-protection-center/safety-tips/policy-enforcement/?srsltid=AfmBOoquHOc1LDCVThszWkPSNfOLnSpIOQzZJJ8otnmlGitZdACUfbnX (last visited Sep. 3, 2026).

[170] *Testing New Ways to Combat Scams & Help Restore Access to Compromised Accounts*, Meta (Oct. 21, 2024), https://about.fb.com/news/2024/10/testing-combat-scams-restore-compromised-accounts/.

[171] *Scams Are Bad for Business: Our Ongoing Efforts to Fight Fraud*, Meta (Dec. 3, 2025), https://about.fb.com/news/2025/12/scams-are-bad-for-business-metas-efforts-to-fight-fraud/.

158. And Meta's 2024 and 2025 annual reports assert that it "maintain[s] advertising policies to protect the security and integrity of our platform and comply with global content, security, and integrity obligations" and makes "ongoing efforts to enhance enforcement against ads and marketers which violate our advertising policies" even though such efforts "adversely affect our revenue."[172]

159. Despite these statements that Defendants were making continuing efforts to police scam ads, as described above, Defendants have actually rolled back and blocked internal efforts to advance the processes and technologies they use to detect and combat scam advertising.

160. For example, in 2023, Meta laid off the entire team investigating scam ads that were hurting legitimate brands. In 2024, Meta disbanded a China-focused anti-scam team, leading to a surge in scam ads from China on its platforms. And internal Meta documents show that Meta shelved multiple anti-scam measures that internal tests indicated would be effective in combating scam ads.

161. Moreover, despite its public pledges to "detect[] and block[]" scam ads, Meta has refused to implement universal advertiser verification—a proven, cost-effective tool that Google has been successfully using since 2020 to combat scam advertising—apparently based on concerns that adoption of the tool would cannibalize revenues, according to internal Meta documents.[173]

**d) Meta Falsely Claims to Coordinate with Government, Law Enforcement, and Industry Peers**

162. Defendants characterize themselves as leaders in the scam prevention space that coordinates closely with law enforcement and industry peers. For example, Meta's Director and Global Head of Security Policy and Counter-Fraud, Nathaniel Gleicher, wrote in a summer 2025 post on LinkedIn:

> Thank you Stop Scams UK for convening this discussion! It's incredibly encouraging to see leaders from across the financial sector, technology sector and government

[172] Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 29, 2025), https://s21.q4cdn.com/399680738/files/doc_financials/2024/ar/Meta-12-31-2024-10K-ARS.pdf. ; Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 28, 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/b919eb05-86d9-4412-a8ff-308be1afb070.pdf.

[173] *Policy enforcement*, Meta, https://www.meta.com/safety/scam-protection-center/safety-tips/policy-enforcement/?srsltid=AfmBOoquHOc1LDCVThszWkPSNfOLnSpIOQzZJJ8otnmlGitZdACUfbnX (last visited Sep. 3, 2026).

> coming together to discuss what we can do to tackle scams together. We are continuing to press to stop scammers on our end, and are excited to work together with our counterparts across society to increase deterrence against scammers and protections for consumers.[174]

163. A Stop Scams UK post further quotes Gleicher as saying: "At Meta, we are committed to creating a safe and secure online environment for all our community. . . . Scams are a society wide problem which requires industry, government and others to work together, and we will continue to expand and evolve our collaboration to stop fraudsters in their tracks."[175]

164. In addition, a March 2026 Meta post touts Meta's participation in the Industry Accord, which it describes as a "landmark voluntary agreement" between it and other technology companies like Amazon and Google that "sets out a framework to implement best practices for multi-sector and stakeholder collaboration on the transnational threat of scams." The post includes the following quotation from Gleicher: "Our work to combat scams focuses on strengthening defenses on our platforms to stay ahead of scammers. Just as critical to our strategy is supporting efforts that drive collective action across sectors and industries to stop scams at its source. Scammers are growing more sophisticated, and they exploit gaps between companies and platforms—which is why tackling global online fraud demands a united, collective response. We look forward to working with the other Accord signatories to enable a stronger global defense to protect people across apps and services."[176]

165. Contrary to these representations, as discussed above, Meta has refused to adopt industry best practices, including universal advertiser verification, even though Google has been using the tool to great effect since 2020. And Meta has recognized in internal documents that "[i]t is easier to advertise scams on Meta platforms than Google." Put another way, even though Meta recognizes that scam advertisers "exploit gaps between companies," and it has seen that dynamic play

[174] Nathaniel Gleicher, *Thank you Stop Scams UK . . .*, LinkedIn (2025), https://www.linkedin.com/posts/nathaniel-gleicher-32167211_thank-you-stop-scams-uk-for-convening-this-activity-7323069250523320321-nJRm.

[175] *Id.*

[176] *Fighting Scammers & Protecting People With New Technology & Partnerships*, Meta (Mar. 11, 2026), https://about.fb.com/news/2026/03/fighting-scammers-protecting-people-with-new-technology-and-partnerships/.

out through its refusal to adopt universal advertiser verification, Meta chooses to maintain those gaps while claiming to members of the public that it is playing a leading role in closing them.[177]

166. And, far from collaborating with law enforcement, internal Meta documents show the company seeks to obfuscate the extent of the "scam ad" problem and take corrective steps only when necessary to avoid near-term regulatory enforcement action. For example, internal Meta documents reveal that Meta seeks to make scam ads "less 'discoverable'" for regulators by identifying keyword searches performed by regulators and scrubbing the results to reduce the "prevalence perception" of scam ads.[178]

167. In other words, Meta takes down scam ads that regulators are most likely to find in their search results to reduce regulators' perception of the prevalence of scams on Meta's platforms, but it does not meaningfully change the actual prevalence of these ads—for example, by blocking the scam advertiser or otherwise stopping generation of new scam ads. Meta includes this "search-result cleanup" strategy in the "general global playbook" it uses to evade regulatory scrutiny. The same playbook includes instructions for resisting government efforts to convince Meta to adopt universal advertiser verification by, among other things, seeking delay through repeated requests for extensions.[179]

168. Meta has also confined its attempts to address scams to steps that minimally impact its revenue. As explained above, after identifying 800 Chinese advertising accounts whose ads had violated Meta's rules, Meta shut down just a handful, and only after concluding it was "likely" that even that fraction of impacted "revenue will return," as Meta did not take any structural steps to address the underlying problem.[180] Worse, when Meta responds to scam reports, it typically does so

---

[177] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/; *Fighting Scammers & Protecting People With New Technology & Partnerships*, Meta (Mar. 11, 2026), https://about.fb.com/news/2026/03/fighting-scammers-protecting-people-with-new-technology-and-partnerships/.

[178] Jeff Horwitz, *Meta created 'playbook' to fend off pressure to crack down on scammers, documents show*, Reuters (Dec. 31, 2025), https://www.reuters.com/investigations/meta-created-playbook-fend-off-pressure-crack-down-scammers-documents-show-2025-12-31/.

[179] *Id*.

[180] Jeff Horwitz & Engen Tham, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, Reuters (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/.

by taking down individual ads rather than banning the accounts that publish them. In the case of misleading ads related to public health topics, this tactic has enabled scammers to immediately resume publishing those ads—"[t]he next day and the next day, they just launch 100 new ads."[181]

169. In sum, Meta's approach to addressing scam advertising does not align with its representation that it acts as a leader in collaborating with government actors to take down scammers. To the contrary, at the end of the day, Meta treats potential regulatory penalties as no more than the cost of doing business, stating in 2024 when it anticipated penalties of up to $1 billion dollars that such a fine "would be much smaller than Meta's revenue from scam ads."[182]

**e) Meta Falsely Claims that Fraud Prevention Efforts are "Comprehensive" and "Extensive"**

170. Defendants characterize their scam prevention efforts as "comprehensive" and "extensive." Meta's Scam Prevention Hub and "Unacceptable Business Practices in Advertising" policy include the following statement: "We take a comprehensive approach to making our technologies a safer place."[183]

171. On its Transparency Center page, Meta's introduction to its Advertising Standards further provides, "When advertisers place an order, each ad is reviewed against our policies."[184]

172. Additionally, an October 2024 Meta post assures members of the public that Meta's "ad review system" uses "automated technology . . . to review every ad" it runs on Facebook and Instagram for policy violations, "including scams."[185]

---

[181] Teddy Rosenbluth, *Facebook Has a Health Scam Problem*, N.Y. Times (Apr. 27, 2026), https://www.nytimes.com/2026/04/27/well/facebook-supplements-health.html.

[182] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[183] *Privacy & Risk Innovation Center*, Meta https://www.meta.com/actions/privacy-and-risk/?srsltid=AfmBOopAcNUu2D9Jt3L4-EP1_vbT7yiHxYz1VBA0ULR_m2NePxdFtIm- (last visited Sep. 3, 2026).

[184] *Introduction to the Advertising Standards*, Meta https://transparency.meta.com/policies/ad-standards/ (last visited Sep. 3, 2026).

[185] *Testing New Ways to Combat Scams and Help Restore Access to Compromised Accounts*, Meta (Oct. 21, 2024), https://about.fb.com/news/2024/10/testing-combat-scams-restore-compromised-accounts/.

173. According to Meta's Business Help Center, which is a publicly available site targeted toward advertisers, "human reviewers" also "manually review ads" in some cases.[186] And a December 2025 Meta post on Facebook states: "[W]e're highlighting our extensive work to combat scams on our platforms."[187]

174. In the same post, under the heading "Our Comprehensive Approach to Aggressive Scam Reduction," Meta states that its "multi-layered approach to combating scams includes: using automated, technical defenses to help protect people on our apps; disrupting criminal scam networks; working with partners across the industry and in law enforcement; and raising awareness about ways to spot and prevent scams."[188]

175. Notwithstanding these strong representations, Meta has in actuality been laying off the "dedicated teams" assigned to work on scam prevention efforts, rolling back and refusing to adopt the processes and technological tools developed and tested by those teams, and setting "revenue guardrails" that prevent those teams from doing their job by prioritizing profits over protecting the public from scams. Meta has also been concealing the extent of the "scam ad" problem from regulatory agencies; refusing to adopt best practices used by industry peers; and improperly rejecting or ignoring "scam ad" reports submitted by users, victims, and people whose likenesses are being appropriated to scam others, including military officials. Moreover, despite Meta's assertion that it reviews every ad for violations of its anti-scam policies, Meta in fact posts ads that it knows are likely to be fraudulent, misleading, or deceptive if the scam advertiser pays an extra surcharge.[189]

176. In sum, in light of Defendants' conduct, their statements—ranging from representations that they treat combating scam ads as a top priority, to representations that they remove scam ads as soon as they become aware of them, to representations that they are constantly

[186] *About ads in review*, Meta, https://www.facebook.com/business/help/204798856225114?id=649869995454285 (last visited Sep. 3, 2026).
[187] *Scams Are Bad for Business: Our Ongoing Efforts to Fight Fraud*, Meta (Dec. 3, 2025), https://about.fb.com/news/2025/12/scams-are-bad-for-business-metas-efforts-to-fight-fraud/.
[188] *Id.*
[189] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, Reuters (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

improving their processes and technologies for combating scam advertising—are false, misleading, and likely to deceive Facebook and Instagram users, including Plaintiffs and members of the Classes.

## E. Plaintiffs Lost Money as a Result of Ads for Crypto Investing That Defendants Targeted to Them via Facebook and Instagram

### 1. Ms. Dassanayake

177. Ms. Dassanayake is a Facebook and Instagram user.

178. Prior to becoming the victim of crypto investment scams, Ms. Dassanayake researched crypto and quant trading on Facebook, YouTube, and other online sources. After she conducted this research, Meta began targeting Ms. Dassanayake via Facebook with ads concerning crypto and quant trading.

179. During the first half of 2025, Ms. Dassanayake clicked several ads that Meta transmitted to her on Facebook purporting to offer sound investment advice, including crypto quant trading, with significant returns. Examples of ads Meta transmitted to Ms. Dassanayake are below:


Find related reels
BUY NOW?
Comment "HELP" or message me directly and I'll walk you through securing your crypto
XRP is about to create multimillionaires. $1,000 of XRP willbe worth over $5 million. Based on usage, XRP demand willoutgrow supply. Move your XRP and other crypto assets off Coinbase, Kraken, Ledger, Ellipal, Tangem, D'Cent, Trezor, Binance US, Uphold, Gemini, and Robinhood. Secure your crypto in a non-custodial Web3 Ledger structured under an LLC & Trust. This helps protect your holdings from hacks, exchange failures, government restrictions, lawsuits, probate and liability while giving you maximum protection, long-term management and direct control.
JV Crypto Hub
Follow
TRUMP PROMISES... more
Add a comment...


Find related reels
AWARENESS & FREEDOM HAS ARRIVED
August 6 2Q26
To get started you will need to hold the recommended assets XRP, XLM, BITCOIN, etc...before you can create a QFS Ledger account.
BIG DADDY
BIG DADDY · Original audio
Follow
To get started with the new financial s... more
Add a comment...


Find related reels
TradingView
Falcon Crypto Trading
#BTC Plan for the Rest of July? MM's ... more
Contact Falcon Crypto Trading
Send message
Sponsored
Add a comment...


BINANCE
CRYPTO COMMUNITY
INDIA
CONNECT • LEARN • SHARE
WHATSAPP
CRYPTO COMMUNITY
MARKET UPDATES
CRYPTO DISCUSSIONS
GLOBAL COMMUNITY
SAFE & FRIENDLY
JOIN WHATSAPP GROUP
BE PART OF THE GROWING CRYPTO COMMUNITY!
Craig Griffiths Vlad...
AI content
Follow
Looking for a crypto community... more
Add a comment...


ARTIFICIAL
INTELLIGENCE
TRADING
NEW BEGINNERS
& INVESTORS
That's interested to begin their
Trading Journey with
Artificial Intelligence
SHOULD CONNECT WITH
ADMIN
MEREDITH FARTWOOD
SMARTER TRADING
AI analyzes the market
so you don't have to.
HIGHER POTENTIAL
AI-powered strategies
aim for consistent growth.
REDUCED EMOTIONS
No fear. No greed.
Just data-driven decisions.
24/7 MARKET MONITORING
Never miss an opportunity –
AI trades while you rest.
CONNECT NOW VIA
TELEGRAM
t.me/OfficialMeredithFartwood
WHATSAPP
+1 681-579-9039
To get started
FOR SERIOUS
INVESTORS ONLY
70
8
Your trading journey deserves the right guidance.
Let AI work for you — and let's grow together.
Artificial Intelligence Trading (crypto,...
Meredith Fartwood
Ready to Start Your AI Trading Journey... more
Add a comment...
GIF


QUANTUM AI
INVESTMENT PLATFORM
AI-POWERED. SECURE. SMART. PROFITABLE.
SECURE BY AI
PROTECTED BY ADVANCED ENCRYPTION
AI ROBOT TRADES FOR YOU. YOU ENJOY THE PROFITS!
10 MOST SECURE CRYPTOCURRENCIES
1 BITCOIN (BTC) The pioneer & most decentralized crypto with unmatched security.
2 ETHEREUM (ETH) Smart contract leader with robust network security.
3 CARDANO (ADA) Research-driven blockchain with high security standards.
4 SOLANA (SOL) High-performance blockchain with advanced consensus.
5 POLKADOT (DOT) Secure multi-chain network with shared security.
6 CHAINLINK (LINK) Decentralized oracle network securing real-world data.
7 AVALANCHE (AVAX) Fast, scalable & secure blockchain platform.
8 BINANCE COIN (BNB) Backed by strong ecosystem & secure infrastructure.
9 TEZOS (XTZ) Self-amending blockchain with on-chain governance.
10 ALGORAND (ALGO) Pure proof-of-stake with enterprise-grade security.
SMART AI. REAL RESULTS. MAXIMUM PROFITS.
Our Quantum AI Robot analyzes the market 24/7, identifies high-probability trades, and executes them with precision — so you don't have to.
AI TRADING ROBOT
ACTIVE
MARKET ANALYSIS IN PROGRESS
RISK MANAGEMENT OPTIMIZED
PROFIT POTENTIAL MAXIMIZED
YOU RELAX, THE ROBOT WORKS, THE PROFITS GROW!
THE IMPORTANCE OF INVESTING WITH QUANTUM AI
AI-POWERED PRECISION Advanced algorithms analyze millions of data points to find the best opportunities.
24/7 AUTOMATED TRADING The AI robot trades for you 24/7 without emotion or human error.
MAXIMUM SECURITY Bank-level encryption and risk management keep your funds 100% secure.
HIGHER ROI POTENTIAL AI identifies high-probability trades to maximize returns consistently.
SAVE TIME & ENERGY No need to watch charts. Let AI handle the work while you focus on life.
SUITABLE FOR EVERYONE Beginner or expert – our AI system is designed for everyone to profit.
POWERED BY ADVANCED AI TECHNOLOGY
AI MACHINE LEARNING Smarter with every trade
RISK MANAGEMENT Capital protection is our priority
FAST TRADE EXECUTION Milliseconds matter
DIVERSIFIED PORTFOLIO Spread risk, maximize growth
REAL-TIME MONITORING Track your profit anytime, anywhere
EXPERT SUPPORT Our team is here for your success
111
GROUP ADMIN
Mrs Emily Aderson
Personalized guidance
Dedicated support
Your success is my priority!
CONTACT DETAILS
WhatsApp: +17472650431
Telegram: https://t.me/QuantumAI_Investment
JOIN THOUSANDS OF SMART INVESTORS WHO ARE ALREADY PROFITING WITH QUANTUM AI!
18
START TODAY
LET AI GROW YOUR WEALTH!
100% SECURE
CONSISTENT PROFITS
SAFE INVESTMENT
WITHDRAW ANYTIME
QUANTUM AI WORKS FOR YOU. YOU WIN!
QUANTUM AI INVESTMENT PLATFO...
Emily Aderson
QUANTUM AI INVESTMENT PLATF... more
Add a comment...







180. Upon clicking on ads with similar characteristics to those shown above, Ms. Dassanayake was directed to join the "B1018 Stella Vision Elite Investors" WhatsApp group, the "Digital DynastyD154" WhatsApp group, and one additional WhatsApp group.

181. Each group Ms. Dassanayake joined used the same tactics. First, members within the WhatsApp group would recommend several U.S. exchange-listed stocks, before directing her to set up an account on a purported crypto exchange platform. At the direction of members within these WhatsApp groups, Ms. Dassanayake set up accounts with the following platforms: Bitmacoin (BM Exchange), Vaultchain, and DOV Exchange. Ms. Dassanayake funded her accounts on each of these platforms with crypto purchased on Coinbase.

182. When Ms. Dassanayake first transferred her money to these purported crypto platforms, she appeared to be reaping good returns. Additionally, in July 2025, the platforms allowed Ms. Dassanayake to withdraw nominal amounts (a few thousand U.S. dollars or less) to give her confidence that the platforms were legitimate.

183. Encouraged by the appearance of significant returns and the withdrawals, Ms. Dassanayake continued to invest funds into her accounts, until she had moved more than $225,000 in crypto to the platforms, transacting in USD Coin (USDC), Tether (USDT), Ethereum (ETH), and Bitcoin (BIT).

184. Between the end of August 2025 and mid-September 2025, Ms. Dassanayake made several attempts to withdraw funds from the three platforms, including attempting to withdraw the full amount of her investments. Her efforts to make these withdrawals were repeatedly denied, and members of the WhatsApp groups told Ms. Dassanayake that she would need to invest additional funds before any withdrawals could be processed.

185. Ms. Dassanayake was removed from all three WhatsApp groups in November 2025.

186. Ms. Dassanayake has reported these scams to Coinbase, the FBI, and the U.S. Secret Service. To date, she has been unable to recover the funds she "invested" on the purported crypto platforms.

187. Meta's practice of specifically targeting vulnerable users with scam ads rather than making good on its assurances that it would monitor for and remove scam ads is illustrated by Meta's actions after she lodged her complaints.

188. After Ms. Dassanayake reported this fraud and initiated recovery efforts, Meta heavily targeted her Facebook and Instagram accounts with more ads promoting crypto investment scams as well as ads "Fraud Recovery Experts," "Fraud Case Experts," and others purporting to help scam victims, including an ad impersonating the FBI. The following are examples of the many ads Meta has served Ms. Dassanayake:


3:43
facebook.com
Barbara A. Thomas
Sponsored
Don't let fraudsters win—we're here to h... See more
FRAUD RECOVERY EXPERTS
WhatsApp
Get Your Money Back: Lawyer Team Spec...
Contact us
5


11:27
facebook.com
Esmond Gerber Paigeu
Sponsored
"Scammed out of $5,000+? ... See more
FEDERAL BUREAU OF INVESTIGATION
COMPLAINT CENTER (IC3)
Are you a victim of online fraud? You don't know how to recover funds after being scammed?
THE FEDERAL BUREAU OF INVESTIGATION HELPS YOU RECOVER LOSSES CAUSE D BY ONLINE SCAMS
Contact us immediately
WhatsApp
No-Win, No-Fee Fund Recovery
WhatsApp
10
7 Comments
10
7
1
Terry Richardson


Jessica Toy Sam
Sponsored
In the United States, if you've been scamme... more
Fraud Case Experts
$68,200
3 Days
Professional Legal Team, Free Recovery of Scammed Funds
Recovered $68,200 in 3 Days
Don't Lt e Scamers Succeed


Investment Overview
Sponsored
Get a free consultation today and learn ... more
ImpaktClaims
Have you fallen victim to a Crypto scam?
CONTACT US
We can help recover funds lost to scammers
Limited spots available
Learn more
39
15
3

189. These ads show that Meta identified Ms. Dassanayake as someone who had lost funds to a crypto scam and monetized her vulnerability to sell ads to "recovery" scammers.

190. Moreover, when Ms. Dassanayake has reported these post-complaint ads to Meta as scams, Meta has refused to remove them. For example, on or around April 21, 2026, Ms. Dassanayake reported a scam quant trading ad that she saw on Facebook to Meta.

191. On April 22, 2026, Meta informed Ms. Dassanayake that it had reviewed the scam ad but did not remove it:




192. Ms. Dassanayake continues to regularly use Facebook and see Facebook ads, and is, therefore, vulnerable to future scams.

193. As a result of Defendants' processes, practices, and policies that facilitate and encourage the display of deceptive and misleading ads on Facebook, Ms. Dassanayake was harmed because she transferred money onto a platform that she would not have otherwise used had she known she was being defrauded.

**2. Mr. Gugel**

194. Mr. Gugel is a Facebook user.

195. During 2022 and 2023, Mr. Gugel researched trending stocks and investment-related advice on Facebook, ChatGPT, and through other online sources. Thereafter, Mr. Gugel began researching crypto investments on Facebook, ChatGPT, and through other online sources.

196. While browsing Facebook in September 2025, Meta served Mr. Gugel several Facebook advertisements promoting investment advice with promises of high investment returns and prompting him to join financial groups via WhatsApp for investment advice with high returns. Below are examples of ads Meta has targeted to Mr. Gugel:







197. The ads Meta targeted to Mr. Gugel via Facebook included multiple ads for SilverSpire Institute, a group of purported financial advisors, offering to teach the basics of investing, provide sound investment advice to beginner investors, and give investors the ability to enjoy substantial returns. Among the multiple SilverSpire ads were some ads featuring public financial figures, including one ad featuring Ark Invest Chief Executive Officer Cathie Wood.

198. After clicking one such ad, Mr. Gugel was offered a link to join a WhatsApp group called "SilverSpire," which he joined. Through the SilverSpire WhatsApp Group, individuals identifying themselves as "Lillian Carter" and "Winston Warwick" directed members to move assets to PGMX, a purported cryptocurrency investment platform.

199. Through the Silverspire WhatsApp group, Mr. Gugel was advised to create a PGMX account.

200. Mr. Gugel transferred assets to the PGMX platform at the direction of those within the Silverspire WhatsApp group. At the group's direction, he transferred money from his bank account to Kraken, a cryptocurrency exchange. Through Kraken (and at the direction of the Silverspire WhatsApp group), Mr. Gugel used his money to purchase the cryptocurrency Ether (ETH). At the direction of the Silverspire WhatsApp group, Mr. Gugel then transferred the Ether he purchased onto the PGMX platform.

201. In total, Mr. Gugel moved $50,000 in assets to the PGMX platform.

202. After transferring his assets to the PGMX platform, the platform initially indicated that Mr. Gugel was receiving positive returns.

203. During January 2026, Mr. Gugel attempted to withdraw his funds from the PGMX platform but was unable to do so.

204. PGMX indicated to Mr. Gugel that withdrawing funds would cause him to incur significant penalty charges.

205. Despite PGMX's warning, Mr. Gugel continued to request withdrawals from his PGMX account, but PGMX would not allow him to withdraw funds.

206. Around February 2026, PGMX stopped responding to Mr. Gugel entirely, and Mr. Gugel was no longer able to access the PGMX platform.

207. Mr. Gugel has since reported this scam to local law enforcement as well as the FBI but has not been able to recover his funds.

208. Mr. Gugel continues to regularly use Facebook and see Facebook ads, and is, therefore, vulnerable to future scams. After clicking on at least one scam ad, Meta has continued to transmit ads for investing scams to Mr. Gugel.

209. As a result of Meta's processes, practices, and policies that facilitate and encourage the display of deceptive and misleading ads on Facebook, Mr. Gugel was harmed because he transferred money onto a platform that he would not have otherwise used had he known he was being defrauded.

**3. Mr. Svoboda**

210. Mr. Svoboda is an Instagram user.

211. While browsing Instagram in March 2025, Meta served Mr. Svoboda several advertisements for investment advice with promises of high investment returns.

212. Some of these advertisements represented the advertised investment services as having the backing of several widely-known successful public figures, including Elon Musk, as well as the backing of Fox News. Each of the advertisements mentioned "QuantumAI":







QuantumAI
FOX NEWS channel
BREAKING NEWS
Quantum AI Redefines Investing!


FOX NEWS channel
BREAKING NEWS
Quantum AI Redefines Investing!
Apply now
152 9
6 views
Click the Apply Now button below the video to join our study group... more
View all comments
Are you interested in this ad?
Help us show the ads that are right for you.
Not interested
Interested


sinpline.com
Instagram
ing: Due to extremely high media der
will close registration as of 10/01/20
HURRY 41:14
uantumAI
Create account
mart Investing
hat Makes You
288 in 5 Hours
nd Cures Poverty
mart investing can make you thousands in less tha
and will help cure poverty while you earn!


Instagram
Winner Game
Sponsored
3:34
QuantumAI
I DON'T KNOW WHAT
Ver detalles
6 1

213. Upon information and belief, Meta had long been on notice that advertisements for "Quantum AI" trading, especially those featuring public figures such as Elon Musk were likely to be fraudulent in nature.

214. On August 15, 2023, RMIT University published a report identifying video advertisements posted to Facebook featuring Elon Musk and attributed to Quantum AI as promoting a financial scam.[190]

215. Additionally, on January 8, 2024, the AI Incident Database reported hundreds of deepfake ads impersonating Former British Prime Minister Rishi Sunak attributed to Quantum AI that appeared on Meta's platforms.[191]

216. The scam QuantumAI ads appearing on Facebook and Instagram were also the subject of a June 5, 2024 report published by the Bureau of Investigative Journalism.[192]

217. During the month of March 2025, Mr. Svoboda clicked one of the ads promoting investment services on Instagram. Upon clicking the ad, Mr. Svoboda was delivered a link to communicate with a purported "financial advisor" via text message.

218. Mr. Svoboda proceeded to communicate with the purported "financial advisor" via text messages, phone calls, and Zoom meetings.

219. Mr. Svoboda's purported "financial advisor" directed Mr. Svoboda to open an account on the InvestGuard Pro online platform, representing that the "financial advisor" would make Bitcoin transactions for Mr. Svoboda on the platform.

220. The "financial advisor" further directed Mr. Svoboda to use a Coinbase account to transfer money from Mr. Svoboda's personal bank account to the InvestGuard Pro platform.

[190] Lulu Graham, *Elon Musk used in fake AI videos to promote financial scam*, RMIT Univ. (Aug. 15, 2023), https://www.rmit.edu.au/news/factlab-meta/elon-musk-used-in-fake-ai-videos-to-promote-financial-scam.

[191] *Incident 875: Coordinated Deepfake Campaign Reportedly Impersonating Rishi Sunak Promoted Fraudulent Quantum AI Investment Platform on Meta*, AI Incident Database, https://incidentdatabase.ai/cite/875/ (last visited Sep. 3, 2026).

[192] Francesca Visser & Niamh McIntyre, *Doctored footage and hijacked accounts: anatomy of a deepfake scam network*, The Bureau of Investigative Journalism, https://www.thebureauinvestigates.com/stories/2024-06-05/anatomy-of-a-deepfake-scam-network.

221. Between March 24, 2025, and September 5, 2025, Mr. Svoboda invested approximately $150,000 of his money on InvestGuard Pro.

222. In the fall of 2025, Mr. Svoboda attempted to withdraw funds from his InvestGuard Pro account. The “financial advisor” refused to withdraw the funds.

223. To this day, Mr. Svoboda has been unable to recover the vast majority funds he transferred to the InvestGuard Pro platform. Between April 2025 and May 2025, Mr. Svoboda’s “financial advisor” sent him amounts below $1,000 less than six times. At that point in time, Mr. Svoboda began requesting that his “financial advisor” withdraw all of his invested funds. Although the “financial advisor” sent Mr. Svoboda a $10,000 payment in June 2025, no additional money has been returned to Mr. Svoboda since that payment.

224. Mr. Svoboda reported this cryptocurrency scam to Instagram, as well as his local police department.

225. Mr. Svoboda continues to regularly use Instagram and see Instagram ads, and is, therefore, vulnerable to future scams.

226. As a result of Defendants’ processes, practices, and policies that facilitate and encourage the display of deceptive and misleading ads on Facebook and Instagram, Mr. Svoboda was harmed because he transferred money onto a platform that he would not have otherwise used had he known he was being defrauded.

**F. The Impact of Defendants’ Tolerance of Scam Ads on Facebook and Instagram**

227. Billions of Facebook and Instagram users have been and continue to be exposed to scam ads due to: (a) Defendants’ misrepresentations about the safety of Facebook and Instagram and their commitment and efforts to combat and prevent fraud, which falsely provide consumers with comfort and assurance that they will be protected from scam advertising; (b) Defendants’ multiple decisions to limit, cancel, or disregard programs and tools proven to limit or prevent scams; (c) Defendants’ policy and practice of sharing in the proceeds of scams by running ads they deem likely to be fraudulent in exchange for an added payment from the scammers behind those ads—which announces to scammers that Facebook and Instagram are open for fraud, at the expense of the public, so long as Meta gets its piece of the proceeds; and (d) Defendants’ provision of AI tools to develop

scam ads, which means that Meta is itself editing and refining scams placed on its platforms, as well as targeting the ads at the consumers most likely to be harmed by them.

228. The scope of the impact to Facebook and Instagram users is massive. Scammers have reaped billions of dollars from consumers — some of which have flowed directly to Defendants as profits — by using Facebook and Instagram to perpetrate their scams.

## VI. CLASS ACTION ALLEGATIONS

229. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4) on behalf of the following Class and Sub-Classes (together, the "Classes"):

> **Nationwide Class:** All persons and entities who received advertisements on Facebook or Instagram and suffered losses after investing in crypto investing scams resulting therefrom.
>
> **Facebook Sub-Class:** All persons and entities who received advertisements on Facebook and suffered losses after investing in crypto investing scams resulting therefrom.
>
> **Instagram Sub-Class:** All persons and entities who received advertisements on Instagram and suffered losses after investing in crypto investing scams resulting therefrom.
>
> **Ad Tool Sub-Class:** All persons and entities who received advertisements on Facebook or Instagram that had been created using Meta's ad tools, including but not limited to "Advantage+ creative," "dynamic creative," and "flexible ad format," and suffered losses after investing in crypto investing scams resulting therefrom.
>
> **Injunctive Relief Class:** All current Facebook and Instagram users.

230. Excluded from the Classes are Defendants and their parents, subsidiaries, corporate affiliates, and governmental entities. Plaintiffs reserve the right to revise the definition of the Classes based upon subsequently discovered information and reserve the right to establish additional Sub-Classes where appropriate.

231. Members of the Classes are so numerous that joinder of all members is impracticable. The precise number of members of the Classes and their identities are unknown to Plaintiffs at this time. Plaintiffs believe that there are at least millions of proposed members of the Classes throughout the United States.

232. Common questions of law and fact exist as to all the members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and

predominating questions of law and fact, each of which may also be certified under Rule 23(c)(4), include, but are not limited to:

a. Whether Defendants' acts and practices violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;

b. Whether the Meta and Instagram Defendants' acts and practices violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*;

c. Whether Defendants breached an express contract;

d. Whether Defendants breached the implied covenant of good faith and fair dealing;

e. Whether Defendants knew, or by exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and caused injuries to users when used in a reasonably foreseeable manner;

f. Whether Defendants breached any duties to members of the Classes;

g. Whether Defendants' breaches resulted in the harm suffered by members of the Classes;

h. Whether Defendants were unjustly enriched at Class members' expense by the conduct described herein; and

i. Whether damages, restitution, injunctive, equitable, compulsory, or other relief is warranted.

233. Plaintiffs' claims are typical of the claims of the Classes that Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendants.

234. Plaintiffs are willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to or in conflict with the interests of the other members of the Classes.

235. Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

236. Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and the absent members of the Classes.

237. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

238. The damages or other financial detriment suffered by individual members of the Classes are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

239. Superiority is particularly satisfied in these circumstances, where the law of a single state will apply to all state law claims. Under the uniform contract terms with Defendants, the law of California will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Members of the Classes under a single state analysis.

240. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

241. The Classes may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

242. The interest of members within the Classes individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

243. The nature of notice to the proposed Classes is contemplated to be the best notice practicable under the circumstances including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII. CLAIMS FOR RELIEF

### COUNT I

**Violations of Cal. Bus. & Prof. Code § 17200, *et seq.***

**Unlawful, Unfair, and Fraudulent Business Practices**

**(Against All Defendants on behalf of Plaintiffs Individually and, Alternatively, on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, and Ad Tool Sub-Class)**

244. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

245. Plaintiffs bring this cause of action individually against all Defendants. Alternatively, Plaintiffs bring this cause of action on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, and Ad Tool Sub-Class against all Defendants.

246. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

247. Defendants have engaged in unlawful, unfair, or fraudulent business practices in connection with: (1) the systematic breach of the Facebook Terms and Instagram Terms and related Advertising Policies and Community Standards; (2) other public facing statements misleading users about Meta and Instagram's scam advertisement related policies and practices; and (3) their material contribution to the scam ads.

248. Defendants' business practices deceptively lead reasonable consumers including Plaintiffs to believe that Defendants prohibit scam advertisements and affirmatively remove the same from their platforms. In reality, Defendants have greatly profited from these advertisements,

materially contributed to their proliferation, and have purposefully deconstructed efforts to limit these scam advertisements to realize revenue.

249. Defendants' conduct alleged herein constitutes "unlawful" business practices and acts under the UCL in that Defendants' conduct violates California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*., as set forth below. These acts also constitute "fraudulent" business acts and practices under the UCL in that Defendants' conduct and business practices are false and have a tendency to deceive or confuse the public.

250. Plaintiffs relied, to their detriment, on Defendants' misleading and deceptive practices, including the misrepresentations and omissions set forth above. Had Plaintiffs been adequately informed and not misled by Defendants, they would have acted differently.

251. Plaintiffs suffered injuries in fact as a result of Defendants' unlawful, unfair, or fraudulent business practices. The harm from Defendants' conduct was not reasonably avoidable by Plaintiffs because only Defendants were aware of the true facts concerning their scam advertisement-related policies and practices, and Defendants did not sufficiently disclose those facts. Defendants' acts and omission are likely to deceive the general public.

252. Defendants' conduct alleged herein also constitutes "unfair" business acts and practices under the UCL in that Defendants' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous.

253. Plaintiffs allege that Defendants have, in the course of their business and the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by, among other things, systematically breaching their contractual obligations to consumers, breaching the implied covenant of good faith and fair dealing under those agreements, and misleading Plaintiffs and the general public regarding their commitment to preventing scam advertisements from reaching users on Facebook and Instagram. That conduct violates the "unfair" prong of the UCL.

254. Defendants' business acts and practices are unfair and violate the UCL because the harm they cause consumers far outweighs any benefit associated with their practices. Meta's practice of prioritizing profits over safety—and providing false assurances while quietly dismantling effective

scam prevention measures and offering AI tools which materially contribute to scam ads—causes significant harm and offers no countervailing benefit to consumers.

255. Defendants engaged in these unlawful, unfair, and fraudulent practices to increase their profits. Accordingly, Defendants have engaged in these unlawful, unfair, and fraudulent business acts and practices, as defined and prohibited by § 17200, *et seq*. of the California Business and Professions Code.

256. Defendants' wrongful conduct emanated out of California where each Defendant is headquartered and where relevant decisions giving rise to the wrongful conduct alleged herein occurred.

257. Upon information and belief, Defendants also authored the Facebook Terms and the Instagram Terms and related Advertising Policies and Community Standards, which they failed to abide by, in California.

258. Upon information and belief, in California, the Defendants also: (1) directed the systematic breach of the Facebook and Instagram Terms of Use; (2) issued other public facing statements about Meta and Instagram's scam advertisement related policies and practices; and (3) materially contributed to scam ads through the use of generative AI and the widespread facilitation of the ads through Defendants' algorithms.

259. Plaintiffs seek an injunction to prohibit the Defendants from continuing to engage in the unlawful, unfair, or fraudulent business acts and practices described herein. Unless and until Defendants are enjoined by an order of this Court, Defendants will continue to cause injury to the general public and violate the laws of California by continuing to deceptively advertise their services. Plaintiffs have no other adequate remedy at law to ensure compliance with Cal. Bus. and Prof. Code § 17200, *et seq*. going forward. Plaintiffs also seek disgorgement, as the equitable relief sought herein is more adequate, certain, prompt, and efficient than any legal remedy available.

260. Plaintiffs also seek reasonable attorneys' fees and costs under applicable law, including Cal. Civ. Proc. Code § 1021.5.

261. Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT II**

**Violations of Cal. Bus. & Prof. Code § 17500, *et seq.***

**False or Misleading Representations**

**(Against All Defendants on behalf of Plaintiffs Individually and, Alternatively, on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, and Ad Tool Sub-Class)**

262. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

263. Plaintiffs bring this cause of action individually against all Defendants. Alternatively, Plaintiffs bring this cause of action on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, and Ad Tool Sub-Class against all Defendants.

264. The False Advertising Law ("FAL"), codified at Business and Professions Code § 17500, *et seq*., makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning . . . real or personal property or . . . services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

265. As alleged above, Defendants have engaged in and continue to engage in, and/or have aided and abetted and continues to aid and abet, acts or practices that violate the FAL through (1) Defendants' statements falsely advertising to consumers the safety and security of their platforms; (2) the extent of Defendants' efforts and commitment to combating fraud, scams, and deceptive advertising practices on their platforms; and (3) Defendants' participation in and contribution to the creation, optimization, and targeting of false and misleading advertisements on Defendants' platforms.

266. As alleged above, Defendants know—and have known for years—that their platforms expose consumers to billions of false and misleading advertisements each day. Despite that knowledge, Defendants have rolled back and declined to adopt effective measures to prevent false and misleading advertisements and have otherwise prioritized profits over efforts to combat false and misleading advertisements. Nonetheless, Defendants falsely assure consumers that their platforms are safe and secure, that they will not tolerate fraud, scams, and deceptive practices, and that

Defendants are "constantly" and "aggressively" combating fraud. Defendants' false and misleading statements to consumers include those set forth above.

267. Defendants made, and continue to make, these false and misleading statements to market their platforms and services to consumers. Defendants' statements, separately and collectively, are likely to deceive consumers who use, or are considering using, the platforms. Based on, among other things, Defendants' tracking of scam advertisements and awareness of their own decisions not to implement fraud prevention measures, Defendants knew, or at a minimum should have known, that their statements were false, misleading, and likely to deceive reasonable consumers.

268. Defendants' false and misleading statements were, and continue to be, widely disseminated through Defendants' websites and the websites of Defendants' platforms, and through other forms of mass media, including those set forth above.

269. Defendants are also liable for violating, and/or aiding and abetting violations of, the FAL by directly participating in, contributing to, encouraging, and/or assisting in the creation, optimization, and steering of the millions of false and misleading advertisements placed on Meta platforms, including Facebook and Instagram. As alleged above, Defendants' participation, contribution, encouragement, and assistance include, but are not limited to (1) offering tools to substantially enhance the fraud's reach; (2) generating, manipulating, and enhancing fraudulent ads; and (3) using their proprietary algorithm to facilitate the targeting of scam ads toward members of the public, such as Plaintiffs.

270. As alleged above, Defendants know or should know that Facebook and Instagram expose consumers to billions of false and misleading advertisements each day and that these advertisements are likely to deceive, and in fact have deceived, reasonable consumers. Defendants also know, or by the exercise of reasonable diligence should know, that their AI tools contribute to the creation and optimization of false and deceptive advertisements and that their algorithms steer false and misleading advertisements to target vulnerable consumers.

271. Defendants participate in, contribute to, encourage, and/or assist in the creation, optimization, and steering of false and deceptive advertisements on Facebook and Instagram in order to maintain and/or increase their advertising revenues, which include billions of dollars from scam

ads. These advertisements are, and have been, widely disseminated on Defendants' platforms and are likely to deceive, and have in fact deceived, reasonable consumers.

272. Plaintiffs suffered injuries in fact as a result of the Defendants' unlawful, unfair, or fraudulent business practices.

273. Defendants' acts and omissions are misleading and/or have a capacity, likelihood, or tendency to deceive or confuse the public.

274. Plaintiffs relied, to their detriment, on Defendants' misleading and deceptive practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs been adequately informed and not misled by Defendants, they would have acted differently.

275. Upon information and belief, Defendants' advertisements, and the misrepresentations and omissions therein, are drafted in, emanate from, and are overseen by Defendants' headquarters located in California.

276. Likewise, upon information and belief, Defendants' material contributions to the creation of scam ads, emanate from and are overseen by Defendants' headquarters located in California.

277. Defendants engaged in the misleading and deceptive advertising and marketing practices set forth above to obtain more platform users and increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by § 17500, *et seq*. of the California Business and Professions Code.

278. Plaintiffs seek an injunction to prohibit Defendants from continuing to engage in the misleading and deceptive advertising practices described herein. Unless and until Defendants are enjoined by an order of this Court, Defendants will continue to cause injury to the general public and violate the laws of California by continuing to deceptively advertise their safety practices. Plaintiffs, on behalf of the general public, have no other adequate remedy at law to ensure compliance with Cal. Bus. & Prof. Code § 17500, *et seq*. going forward. Plaintiffs also seek disgorgement, as the equitable relief sought herein is more adequate, certain, prompt, and efficient than any legal remedy available.

279. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT III

## Breach of Express Contract

## (Against All Defendants on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class)

280. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

281. Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class against all Defendants.

### Consent

282. By using Facebook and Instagram, both Defendants and Plaintiffs voluntarily consented to be bound by the platforms' use of service.

283. More particularly, both the Facebook Terms and Instagram Terms provide that the Terms "constitute an agreement between you and Meta Platforms, Inc."

### Consideration

284. In consideration for using Defendants' platforms and being bound by their respective Terms, Plaintiffs offered valuable consideration.

285. In particular, Ms. Dassanayake, Mr. Gugel, and the Facebook Class, with respect to Facebook, agreed that Meta "can show [them] personalized ads and other commercial and sponsored content that businesses and organizations pay [Meta] to promote on and off Meta Company Products."[193] Further, Ms. Dassanayake, Mr. Gugel, and the Facebook Class agreed that Meta could use their "personal data, such as information about [their] activity and interests, to show [them] personalized ads and sponsored content that may be more relevant."[194]

286. Ms. Dassanayake, Mr. Gugel, and the Facebook Class also agreed not to use Facebook in such a manner that violated Meta's "Terms, the Community Standards" or other applicable terms and policies such as Meta's Advertising Policies.

[193] *Terms of Service Overview*, Meta (Effective from Jan. 1, 2025), https://www.facebook.com/terms?section_id=0_overview.
[194] *Id.*

287. Likewise, with respect to Instagram, Mr. Svoboda and the Instagram Class agreed and acknowledged that Defendants could "show [them] ads that businesses and organizations pay [Defendant] to promote on and off the Meta Company Products."[195] Mr. Svoboda and the Instagram Class also agreed that Defendants could "use [their] personal data, such as information about [their] activity and interests, to show [them] ads that are more relevant."[196]

288. In consideration for using Instagram, Mr. Svoboda and the Instagram Class also agreed that they would not violate Instagram's Terms of Use, policies or Community Standards.

**Performance**

289. Plaintiffs and members of the Classes performed under the contract.

**Meta and Instagram Breached their Express Contracts**

290. Plaintiffs and other members of the Classes entered into a contract with Defendants consisting of the Facebook and Instagram Terms, which incorporated by reference, *inter alia*, the Community Standards and Advertising Policies.

291. The agreements contain enforceable promises that Defendants made to Plaintiffs and other members of the Classes, including, but not limited to, those as follows.

292. The Instagram Terms provide that:

> We develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive, including when we think they might need help. ***We also have teams and systems that work to combat abuse and violations of our Terms and policies***, as well as harmful and deceptive behavior. ***We use all the information we have-including your information-to try to keep our platform secure***.[197]

293. Further, the Instagram Terms provide that, "***[w]e can remove any content or information you share on the Service if we believe that it violates these Terms of Use, our policies (including our Community Standards)***, or we are permitted or required to do so by law."[198]

294. Likewise, in the Facebook Terms, Meta states that:

> We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to ***detect***

[195] *Terms of Use*, Instagram, https://help.instagram.com/termsofuse (last visited Sep. 3, 2026).
[196] *Id.*
[197] *Id.* (emphasis added).
[198] *Id.* (emphasis added).

> ***potential misuse of our Products, harmful conduct towards others***, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, ***we may take appropriate action*** based on our assessment that may include - notifying you, offering help, removing content, removing or restricting access to certain features, ***disabling an account***, or contacting law enforcement.[199]

295. The Facebook Terms also provide that "***we develop automated systems to improve our ability to detect and remove abusive and dangerous activity*** that may harm our community and the integrity of our Products."[200]

296. The Community Standards that both the Facebook and Instagram Terms incorporate by reference explains that Defendants "aim to protect users and businesses from being deceived out of their money, property or personal information."[201] To that end, Defendants "***remov[e] content and combatting behavior that purposefully employs deceptive means*** - such as wilful misrepresentation, stolen information and exaggerated claims - to either scam or defraud users and businesses, or to drive engagement."[202]

297. Meta's "Fraud, Scams, and Deceptive Practices" policy states that Defendants "aim to protect users and businesses from being deceived out of their money, property or personal information."[203] To that end, Defendants "remov[e] content and combatting behavior that purposefully employs deceptive means - such as wilful misrepresentation, stolen information and exaggerated claims - to either scam or defraud users and businesses, or to drive engagement."[204]

298. Moreover, Section 5 of the Facebook Terms incorporates Meta's "Advertising Policies" by reference. Those Policies prohibit ads which promote "products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information."[205] Those Policies also state that "[w]e use automated and, in some instances,

---

[199] *Terms of Service Overview*, Meta (Effective from Jan. 1, 2025), https://www.facebook.com/terms?section_id=0_overview (emphasis added).
[200] *Id.* (emphasis added).
[201] *Fraud, scams and deceptive practices*, Meta, https://transparency.meta.com/policies/community-standards/fraud-and-scams/ (last visited Sep. 3, 2026).
[202] *Id.* (emphasis added).
[203] *Id.*
[204] *Id.*
[205] *Introduction to the Advertising Standards*, Meta, https://transparency.meta.com/policies/ad-standards/ (last visited Sep. 3, 2026).

manual review to enforce our policies. Beyond reviewing individual ads, we also monitor and investigate advertiser behavior, and may restrict advertiser accounts that don't follow our Advertising Standards, Community Standards or other Meta policies."[206]

299. Meta's Advertising Standards include a separate "Unacceptable Business Practices" policy that provides: "Ads must not promote products, services, schemes or offers using identified deceptive or misleading practices, including those meant to scam people out of money or personal information."[207] That policy also includes Meta's "Guidelines for Ads," which provides that:

> Ads can't:
>
> Use deceptive or exaggerated claims about the success of a product or service to mislead people into purchasing or sharing sensitive information
>
> Use deceptive or exaggerated claims about health-related benefits of a product or service to mislead people into purchasing or sharing sensitive information
>
> Use the image of a famous person and misleading tactics in order to bait people into engaging with an ad
>
> Promise financial benefits by misrepresenting an entity, industry association or news outlet to mislead people or ask them to share sensitive information.[208]

300. Meta concludes its "Unacceptable Business Practices in Advertising" policy by promising that, with regard to "scams," "we take a comprehensive approach to making our technologies a safer place."[209]

301. The Advertising Policies also maintain a crypto specific provision which provides that "[a]ds may not promote cryptocurrency trading platforms, software and related services and products that enable monetisation, reselling, swapping or staking of cryptocurrencies without prior written permission."[210] The policy further provides that those seeking to advertise crypto and related services must "provide evidence that their activities are appropriately licensed."[211]

---

[206] *Id.*
[207] *Id.*
[208] *Id.*
[209] *Id.*
[210] *Cryptocurrency Products and Services*, Meta, https://transparency.meta.com/policies/ad-standards/restricted-goods-services/cryptocurrency-products-and-services/ (last visited Sep. 3, 2026).
[211] *Id.*

302. Meta states that it engages in a two-part review process for cryptocurrency ads, including "identif[ying] whether the ads are within the scope of the cryptocurrency ads policy" and "check[ing] to see if the associated ad account has been approved to advertise cryptocurrency products and services."[212]

303. Defendants materially breached these promises by actively and affirmatively soliciting, encouraging, and assisting advertisers it knew or should have known were defrauding Facebook users, including, without limitation, by:

a. Affirmatively directing employees and contractors monitoring Facebook and Instagram to ignore harmful ads that were in violation of Meta's Advertising Policies;

b. Failing to review ads for compliance with Meta's Advertising Policies, including the provisions requiring advertisers promoting crypto investment to apply for authorization before taking out an ad; and

c. Affirmatively enabling advertisers whose accounts were banned to quickly resume placing harmful ads on Facebook and Instagram through lax enforcement of Defendants' advertising policies.

**Plaintiffs and Members of the Classes Were Damaged**

304. Defendants' breach caused Plaintiffs and members of the Classes the following damages, among others:

a. Nominal damages for each breach of contract by the Defendants;

b. Plaintiffs and members of the Classes did not get the full benefit of their bargain, which included Defendants' duty to review ads to determine whether they may be harmful and/or fraudulent before displaying them to Facebook and/or Instagram users and to remove harmful and/or fraudulent ads; and

c. Plaintiffs and members of the Classes provided the Defendants with valuable consideration—namely the authority to show Plaintiffs and members of the Classes

[212] *About Meta's advertising policy on Cryptocurrency Products and Services*, Meta, https://www.facebook.com/business/help/438252513416690?id=595195347635322 (last visited Sep. 3, 2026).

advertisements while using the platforms—which the Defendants unjustly monetized—and Plaintiffs and members of the Classes would not have provided had they known about Defendants' misrepresentations.

305. Plaintiffs and members of the Classes also seek attorneys' fees and costs on this claim to the extent allowable.

**COUNT IV**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

**(Against All Defendants on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class)**

306. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

307. Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class against all Defendants.

308. In every contract there is an implied promise of good faith and fair dealing.

309. Plaintiffs and members of the Classes entered into a services contract with Defendants consisting of the Facebook Terms and Instagram Terms, which incorporated by reference the Community Standards, and the Advertising Policies.

310. The Facebook Terms and Instagram Terms contain enforceable promises that Meta made to Plaintiffs and other members of the Classes, including without limitation, the promises set forth in paragraphs 115-139 above.

311. By actively and affirmatively soliciting, encouraging, and assisting advertisers they knew or should have known were defrauding Facebook and Instagram users—including without limitation, by taking the actions detailed in paragraph 303 above—Defendants engaged in conduct that frustrated and interfered with the rights of Plaintiffs and other members of the Classes to the benefits of the Facebook Terms and Instagram Terms, the Community Standard, and the Advertising Policies.

312. Plaintiffs performed all, or substantially all, of their material obligations under the Facebook Terms and Instagram Terms.

313. As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs and members of the Classes suffered damages and Defendants unjustly profited.

314. Plaintiffs and members of the Classes seek appropriate relief for their injuries, including, but not limited to, injunctive relief and damages that will reasonably compensate Plaintiffs and members of the Classes for the harm incurred as a result of Defendants' breach of the covenant of good faith and fair dealing.

315. Plaintiffs and members of the Classes also seek attorneys' fees and costs on this claim to the extent allowable.

**COUNT V**

**Negligence**

**(In the Alternative; Against All Defendants on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class)**

316. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

317. Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class against all Defendants.

318. Plaintiffs bring this cause of action in the alternative to their claims for breach of express contract and breach of the implied covenant of good faith and fair dealing.

319. At all relevant times, Defendants designed, managed, operated, controlled, and profited from Meta's advertisement business.

320. Defendants have a special relationship with Plaintiffs and members of the Classes and owe them independent legal duties to perform the services they provide through Facebook and Instagram in a manner that protects them from being defrauded by scammers.

321. Further, Defendants owe a duty to the public, including Plaintiffs and members of the Classes, to design and operate their advertising business in a commercially reasonable manner. *See* Cal. Civ. Code § 1714.

322. Defendants knew, or reasonably should have known, that advertisers were placing ads on Facebook and Instagram that were designed to and responsible for scamming Facebook and Instagram users out of money and other property.

323. Defendants materially contributed to the scam ads by, *inter alia*: (1) offering tools to substantially enhance the fraud's reach; (2) generating, manipulating, and enhancing fraudulent ads; and (3) using their proprietary algorithm to facilitate the targeting of scam ads toward members of the Classes, such as Plaintiffs.

324. Defendants had the capability, without undue burden, to identify and remove the deceptive ads once created, but they failed to do so.

325. Defendants actively solicited, encouraged, and assisted scammers they knew or reasonably should have known were carrying out a fraudulent scheme by materially contributing to the development of scam ads.

326. Defendants knew or should have known that Plaintiffs and members of the Classes, acting reasonably, would have believed the scam ads were real, offered legitimate crypto investment opportunities, and had been vetted by Defendants pursuant to the Advertising Policies.

327. Defendants breached their duty to Plaintiffs and members of the Classes by: (1) knowingly disseminating scam ads; (2) knowingly contributing the production of scam ads by applying their advertising tools to generate, manipulate, and enhance scam Ads; (3) knowingly designing and utilizing defective procedures to screen or vet scam advertisements; and (4) knowingly failing to follow their own ad review policies and criteria.

328. As a direct and proximate result of Defendants' breach of duty, Plaintiffs and members of the Classes were harmed by, *inter alia*, losing money.

329. Defendants knew or should have known that breaching their duty to Plaintiffs and the member of the Classes would harm them.

330. A reasonably prudent advertising business would, *inter alia*: (1) adopt effective verification processes for advertisers on its platform; (2) effectively review advertisements before publication; (3) design a review process and hire employees tasked with effectively identifying scam ads before publication; and (4) provide adequate warning to users, including Plaintiffs and members of the Classes.

331. At all relevant times, Defendants could have (1) adopted effective verification processes for advertisers on their platforms; (2) effectively reviewed advertisements before publication; (3) designed a review process and hire employees tasked with effectively identifying scam ads before publication; and (4) provided adequate warning to users, including Plaintiffs and members of the Classes. Had Plaintiffs and members of the Classes received proper or adequate warnings about the risks of deceptive and fraudulent third-party advertisements as described herein, Plaintiffs and members of the Classes would have heeded such warnings.

332. Plaintiffs and members of the Classes seek appropriate relief for these injuries, including, but not limited to, injunctive relief and damages that will reasonably compensate Plaintiffs and members of the Classes for the harm incurred as a result of Defendants' conduct.

333. Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT VI**

**Negligent Failure to Warn**

**(In the Alternative; Against All Defendants on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class)**

334. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

335. Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class against all Defendants.

336. Plaintiffs bring this cause of action in the alternative to their claims for breach of express contract and breach of the implied covenant of good faith and fair dealing.

337. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from their products, including Facebook and Instagram, being used by Plaintiffs and members of the Classes.

338. In conjunction with the operation of these platforms, Meta and Instagram offered advertising services to businesses wishing to market products and services to Facebook and Instagram users such as Plaintiffs and members of the Classes.

339. As part of their advertising service, Meta and Instagram supplied tools to help those businesses – including scam advertisers – create, enhance, and develop advertisements including scam ads.

340. Plaintiffs and members of the Classes were users of Facebook and Instagram and were thus foreseeable recipients of scam ads.

341. Defendants knew, by the exercise of reasonable care, or should have known, that their tools were being used to create, enhance, and develop scam advertisements.

342. Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs and members of the Classes would not have realized the potential harms, risks, and dangers of their products including, without limitation, the risk of third party advertisers posting, disseminating, sharing, and targeting deceptive ads in furtherance of efforts to lure users including Plaintiffs and members of the Classes into fraudulent transactions.

343. Defendants knew, or by the exercise of reasonable care, should have known that Facebook and Instagram posed risks to their users. These risks were known and knowable in light of Defendants' own internal data and knowledge regarding their products and advertisers at the time of the development, design, marketing, promotion, advertising, and distribution to Plaintiffs and members of the Classes.

344. Defendants owed a duty to all reasonably foreseeable users to provide adequate warnings about the risk of using Facebook and Instagram that were known to Defendants, or that Defendants should have known through the exercise of reasonable care.

345. Defendants had a duty to make adequate disclosures and warn their users of the danger presented and inform them of the need to screen and verify the legitimacy of advertising posted on Facebook and Instagram.

346. Defendants knew that Plaintiffs and members of the Classes, by using Facebook and Instagram, were exposed to an unreasonable risk of harm from the foreseeable risk of fraudulent advertising placed on the platform.

347. Defendants knew or should have reasonably known based on users' complaints that Facebook and Instagram users did not realize the danger of deceptive ads on Facebook and Instagram before they were victimized.

348. Defendants had superior knowledge of the fraudulent advertising being placed on Facebook and Instagram.

349. Defendants controlled Facebook and Instagram and had the means and ability to warn Facebook and Instagram users of a known harm.

350. Defendants had a duty to disclose to, or warn Plaintiffs and members of the Classes, of the dangers that were known to Defendants from advertisers placing fraudulent advertising on Facebook and Instagram.

351. Defendants owed Plaintiffs and members of the Classes a duty of protection from reasonably foreseeable harm.

352. Defendants owed Plaintiffs and members of the Classes a duty to exercise due care so as not to create an unreasonable risk of injury to Facebook and Instagram users.

353. Defendants breached their duty by failing to use reasonable care in providing adequate warnings to Plaintiffs and members of the Classes, as set forth herein.

354. Defendants breached their duty to Plaintiffs and members of the Classes by failing to provide adequate or sufficient warning that would have placed Plaintiffs and members of the Classes on notice of the danger and prevented the harm.

355. Defendants' failure to warn Plaintiffs and members of the Classes of the danger presented by advertisers who place fraudulent ads on Facebook and Instagram demonstrates an egregious failure to exercise reasonable care.

356. A reasonable company under the same and similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including Plaintiffs and members of the Classes.

357. At all relevant times, Defendants could have provided adequate warnings to prevent the harms and injuries described herein.

358. Had Plaintiffs and members of the Classes received proper or adequate warnings about the risks of deceptive and fraudulent third-party advertisements as described herein, Plaintiffs and members of the Classes would have heeded such warnings.

359. As a direct and proximate result of Defendants' breach of their duty to provide adequate warnings, Plaintiffs and members of the Classes were harmed and sustained injuries set forth herein. Defendants' failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs and members of the Classes.

360. As a direct result of Defendants' negligent breach of their duty to warn, Plaintiffs and members of the Classes were unknowing and helpless victims of the deceptive and fraudulent advertising on Facebook and/or Instagram.

361. The nature of Defendants' deceptive and fraudulent acts that created harms, risks, and dangers are not the type that are immediately apparent from using Facebook and Instagram. Plaintiffs and many members of the Classes are continuing to use Facebook and/or Instagram. When Plaintiffs and members of the Classes use Facebook and/or Instagram, they will not be independently able to verify whether Facebook and Instagram continue to pose an unreasonable risk or rely on Defendants' representations in the future.

362. Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and conscious and depraved indifference to the consequences of their conduct, including the exploitation of Facebook's and Instagram's reach and targeting capabilities to defraud unsuspecting victims. The problem is compounded by the ease of posting, disseminating, sharing, and targeting deceptive and fraudulent advertisements and the financial incentives for Defendants, who profit from advertising revenue.

363. Plaintiffs and members of the Classes demand judgment against Defendants for injunctive relief and for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT VII**
**Unjust Enrichment**
**(In the Alternative; Against All Defendants on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class)**

364. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint.

365. Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, Facebook Sub-Class, Instagram Sub-Class, Ad Tool Sub-Class, and Injunctive Relief Class against all Defendants.

366. Plaintiffs bring this cause of action in the alternative to their claims for breach of express contract and breach of the implied covenant of good faith and fair dealing.

367. Defendants receive a benefit in the form of advertising revenue they receive from the scam ads to which they materially contribute.

368. Defendants benefited at Plaintiffs' and members of the Classes' expense when they collected advertising revenue in connection with scam ads that were transmitted to users on Facebook and Instagram.

369. It would be unjust and/or unfair for Defendants to retain the benefit they received from transmitting scam ads to Plaintiffs and members of the Classes.

370. Plaintiffs and members of the Classes are entitled to restitution and/or disgorgement of all profits Defendants have unjustly kept from permitting the publishing of and materially contributing to scam ads.

371. Plaintiffs and the Classes otherwise lack an adequate remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

a. An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

b. An order enjoining the Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, by making untrue, false, deceptive, and/or misleading statements in connection with the Facebook Terms, Instagram Terms, Community Standards, Advertising Policies, and other public facing advertisements informing users that Defendants will review ads for potential harm to Facebook and Instagram users and will remove harmful ads while, in truth, knowingly allowing harmful ads to reach users;

c. A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

d. An order awarding costs, restitution, disgorgement, punitive damages, and exemplary damages under applicable law, and compensatory damages for economic loss, and out-of-pocket costs in an amount to be determined at trial;

e. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

f. An award of costs, expenses, and attorneys' fees as permitted by law; and

g. Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED: September 3, 2026

Respectfully submitted,

*/s/ Stacey M. Kaplan*

Stacey M. Kaplan (Bar. No. 241989)
skaplan@ktmc.com
**KESSLER TOPAZ MELTZER & CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Melissa L Yeates (*pro hac vice* forthcoming)
myeates@ktmc.com
Tyler S. Graden (*pro hac vice* forthcoming)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
Daniel S. Dicce (*pro hac vice* forthcoming)
ddicce@ktmc.com
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Tom P. Cartmell (*pro hac vice* forthcoming)
Tyler W. Hudson (*pro hac vice* forthcoming)
J. Kirk Goza (CA Bar #297482)
Lauren K. Bretz (*pro hac vice* forthcoming)
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1100
tcartmell@wcllp.com
thudson@wcllp.com
jgoza@wcllp.com
lbretz@wcllp.com

*Counsel for Plaintiffs and the Putative Classes*